## STATE OF CONNECTICUT *v.* REYNALDO ARROYO
### (SC 18031)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 17—officially released July 21, 2009

*Andrew S. Liskov*, special public defender, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, and *Maureen Platt*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The defendant, Reynaldo Arroyo, was convicted, after a jury trial, of felony murder in violation of General Statutes § 53a-54c,[1] conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a)[2] and 53a-48, and larceny in the fifth degree in violation of General Statutes §§ 53a-125a (a)[3]

---

[1] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[2] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[3] General Statutes § 53a-125a (a) provides: "A person is guilty of larceny in the fifth degree when he commits larceny as defined in section 53a-119 and the value of the property or service exceeds two hundred fifty dollars."

and 53a-119.[4] The defendant appealed from the judgment to the Appellate Court, which affirmed the judgment of conviction. *State* v. *Arroyo*, 104 Conn. App. 167, 187, 931 A.2d 975 (2007). Thereafter, this court granted the defendant's petition for certification to appeal limited to the following issues: (1) "Did the Appellate Court properly determine that the special credibility instruction mandated in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), was not applicable?"; and (2) "Did the Appellate Court properly determine that the verdicts were not legally inconsistent?" *State* v. *Arroyo*, 284 Conn. 938, 937 A.2d 694 (2007). With respect to the first claim, we conclude that, although *Patterson* does not require a special credibility instruction if a jailhouse informant has not received a promise of a benefit in exchange for his testimony; see *State* v. *Patterson*, supra, 469; the *Patterson* rule should now be expanded to apply to all jailhouse informant testimony. We also conclude, however, that the absence of such an instruction in the present case was harmless. With respect to the second claim, we conclude that we need not determine whether the verdicts in the present case were legally inconsistent because we conclude, in accordance with *United States* v. *Powell*, 469 U.S. 57, 69, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984), that claims of legally inconsistent verdicts are not reviewable. Accordingly, we affirm the judgment of the Appellate Court on these alternate grounds.

As set forth in the Appellate Court's opinion, the jury reasonably could have found the following facts. "On the afternoon of March 28, 2001, the defendant asked his neighbor [Charles Smith] if he could borrow money, stating that he would pay the money back after he went

---

[4] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

on 'a mission.' Later that evening, the defendant and Richmond Perry drove to Mike's Package Store in Middlefield. At the counter, an argument ensued between the defendant and the owner of the store, Edmund Caruso, over the amount of change the defendant received from his purchase. The argument escalated, and the defendant pulled out a handgun and jumped over the counter. The defendant pushed Caruso, who then sprayed Mace at both the defendant and Perry. During the altercation, Caruso was shot several times and subsequently died as a result of his injuries. Following the shooting, the defendant and Perry fled from the scene with the cash register. The defendant was arrested several weeks later." *State* v. *Arroyo*, supra, 104 Conn. App. 169.

Thereafter, the defendant was charged with felony murder, murder in violation of General Statutes § 53-54a (a), robbery in the first degree, larceny in the fifth degree and conspiracy to commit robbery in the first degree. The jury found him guilty of felony murder, larceny in the fifth degree and conspiracy to commit robbery in the first degree and acquitted him of murder and robbery in the first degree, and the trial court rendered judgment accordingly. Id., 170.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court improperly had: (1) denied his request for a special credibility instruction concerning the testimony of two jailhouse informants pursuant to *State* v. *Patterson*, supra, 276 Conn. 452; *State* v. *Arroyo*, supra, 104 Conn. App. 170; and (2) denied his motion for a judgment of acquittal with respect to the felony murder charge, because the verdict of guilty on that charge was inconsistent with the verdict of not guilty on the charges of robbery in the first degree, which was the predicate felony for the felony murder charge. Id., 179. The Appellate Court rejected the defendant's first claim because it concluded that a

*Patterson* charge is required only when the state has promised some benefit to the jailhouse informant in exchange for testifying, and there was no evidence of such a promise in this case. Id., 174. The Appellate Court rejected the defendant's second claim because it concluded that, in order to convict the defendant of felony murder, the jury was required to find that the defendant or another participant had caused Caruso's death in the course of a robbery in violation of General Statutes § 53a-133; see footnote 2 of this opinion; whereas, in order to convict the defendant of robbery in the first degree in violation of § 53a-134 (a) (2), the jury would have been required to find that the defendant had committed robbery while armed with a deadly weapon. *State* v. *Arroyo*, supra, 183. Because the elements of the two offenses were different, the Appellate Court concluded that the verdicts were not legally inconsistent. Id., 184. Accordingly, the court affirmed the judgment of conviction. Id., 187.

This certified appeal followed. The defendant claims that the Appellate Court improperly affirmed the trial court's denial of his request for a charge under *Patterson* because that case requires a special credibility instruction on jailhouse informant testimony regardless of whether the informant has received a promise of a benefit in exchange for his testimony. He also contends that, if this court disagrees with this interpretation of *Patterson*, this court should expand the *Patterson* rule to apply to all jailhouse informant testimony. The defendant further claims that the Appellate Court improperly determined that robbery in the first degree is not a lesser included offense of felony murder for purposes of establishing a legally inconsistent verdict. The state disputes these claims and also contends, essentially as alternate grounds for affirmance, that: (1) even if the trial court's failure to give a special credibility instruction concerning the testimony of the jailhouse infor-

mants pursuant to *Patterson* was improper, it was harmless; and (2) this court should adopt the rule set forth by the United States Supreme Court in *United States* v. *Powell,* supra, 469 U.S. 69, that a claim that a verdict is legally inconsistent is not reviewable.

We disagree with the defendant that *Patterson* applies even when a jailhouse informant has not received a promise of a benefit in exchange for his testimony, but agree with him that the *Patterson* rule should be expanded and that the trial court must give a special credibility instruction even when the informant has not received an express promise of a benefit. We agree with the state, however, that the absence of a *Patterson* charge in the present case was harmless. We also agree with the state that claims of legally inconsistent verdicts are not reviewable, in accordance with *Powell.* Accordingly, we affirm the judgment of the Appellate Court on these alternate grounds.

I

We first address the defendant's claim that the Appellate Court improperly determined that the trial court properly had refused to give a special credibility instruction concerning the testimony of the jailhouse informants pursuant to *Patterson.* The opinion of the Appellate Court sets forth the following additional facts and procedural history that are relevant to our resolution of this claim. "At trial, the state presented the testimony of Thomas Moran and Ronald Avery. While awaiting their trials, Moran and Avery shared a courthouse lockup cell with the defendant. Both Moran and Avery testified that while in the lockup, on different occasions, the defendant confessed to them that he and Perry had robbed the package store and had shot Caruso.

"Prior to his conversations with the defendant in the lockup, Moran had known the defendant and had lived

with him for a short period of time earlier that year. Moran testified that although he had an extensive criminal record, he did not 'believe in violence' and was testifying because 'it was the right thing to do.' The jury heard evidence that Moran had attempted to use the information three different times in an effort to negotiate an agreement with the state, even though from the beginning, he was told, 'you'll get nothing.' Moran's attempts to obtain benefits in exchange for his cooperation were futile.

"Avery met the defendant for the first time while in the lockup at the Norwich courthouse. Avery testified that he did not believe the defendant initially, but decided to come forth with the information after seeing the incident reported on the news. Avery testified that he thought there would be a monetary reward for the information, and, furthermore, he had hoped to use the information to 'get some play' on his case.

"Prior to the conclusion of the trial, the defendant requested that the judge instruct the jury that it should weigh, examine and view Moran's and Avery's testimony with great caution, care and scrutiny to determine whether the testimony had been affected by bias or prejudice against the defendant, and to consider whether Moran and Avery testified to serve their own self-interest because they believed or hoped that they would benefit by falsely implicating the defendant.

"The court denied the defendant's request but instructed the jury to consider the motives of any witness and the credibility of his or her testimony, taking into account all the evidence as well as any inconsistencies in the witness' testimony and whether the witness had an interest in the outcome of the trial or any bias or prejudice toward any party or any matter in the case." *State* v. *Arroyo*, supra, 104 Conn. App. 170–71.

"Our analysis begins with a well established standard of review. When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995).

In *State* v. *Patterson*, supra, 276 Conn. 469, this court stated that "an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant, like that of an accomplice, is inevitably suspect." We concluded, therefore, that the defendant in that case was entitled to a jury instruction that the testimony of the informant, who had received a promise of a sentence reduction, should "be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness." (Internal quotation marks omitted.) Id., 465.

The defendant in the present case contends that, under *Patterson*, a special credibility instruction is required even when a jailhouse informant has not received a promise of a benefit. He contends that the mere expectation of a benefit is sufficient. See id., 470 ("the testimony of an informant who expects to receive a benefit from the state in exchange for his or her cooperation is no less suspect than the testimony of

an accomplice who expects leniency from the state"). Alternatively, the defendant contends that Moran expressly was promised that he would receive a benefit in exchange for his testimony.[5] Finally, the defendant contends that, if *Patterson* does not apply, this court should expand its application to all jailhouse informant testimony. Although we do not agree with the defendant that *Patterson* applies even when a jailhouse informant has not received a promise of a benefit, we conclude that *Patterson*'s requirement for a special credibility instruction now should be extended to apply to the testimony of all jailhouse informants.[6]

In recent years, there have been a number of high profile cases involving wrongful convictions based on the false testimony of jailhouse informants. See, e.g., R. Bloom, "Jailhouse Informants," 18 Crim. Just. 20 (Spring 2003).[7] Several of these cases resulted in formal investigations that shed much needed light on the extensive use of jailhouse informants in criminal prosecutions, an issue that previously had been "largely a closeted aspect of the criminal justice system." Id. One such investigation, by a grand jury in Los Angeles county, California, revealed an "appalling number of instances of perjury or other falsifications to law

---

[5] In support of this claim, the defendant points to the testimony of Moran's counsel that she was told that " 'the court *may* take judicial notice of his cooperation in an ongoing investigation at his sentencing.' " (Emphasis in original.) *State* v. *Arroyo*, supra, 104 Conn. App. 174 n.4.

[6] Accordingly, we need not reach the defendant's claim that Moran received a promise of a benefit in exchange for his testimony.

[7] Bloom discusses the case of Leslie Vernon White, who fabricated the confessions of a large number of fellow prisoners while incarcerated in California in the 1980s, the false convictions of Guy Paul Morin and Thomas Sophonow in Canada, based on the testimony of a jailhouse informant, and the reversal of a large number of capital felony convictions in Illinois, forty-six of which had involved the testimony of jailhouse informants. R. Bloom, supra, 18 Crim. Just. 20–21; see also E. Dodds, note, "I'll Make You a Deal: How Repeat Informants Are Corrupting the Criminal Justice System and What To Do About It," 50 Wm. & Mary L. Rev. 1063, 1073–79 (2008).

enforcement . . . ."[8] (Internal quotation marks omitted.) C. Sherrin, "Jailhouse Informants, Part I: Problems with their Use," 40 Crim. L. Q. 106, 113 (1997). The grand jury also "found that a particularly clever informant realizes that a successful performance on the witness stand is enhanced if it appears he or she is not benefiting from the testimony. . . . These informants wait until after they've testified to request favors—a request that is generally answered. . . . And, because the reward is not offered before the testimony, the jury has no way to measure the informant's motivation to fabricate testimony, as the prosecutor . . . is under no obligation to disclose nonexisting exculpatory evidence." (Citations omitted.) R. Bloom, supra, 18 Crim. Just. 24. Thus, the expectation of a "[r]eward for testifying is a systemic reality"; id.; even where the informant has not received an explicit promise of a reward.[9] In addition,

---

[8] See also A. Natapoff, comment, "Beyond Unreliable: How Snitches Contribute to Wrongful Convictions," 37 Golden Gate U. L. Rev. 107, 109 (2006) (estimating that approximately 21 percent of wrongful capital convictions are influenced by jailhouse informant testimony and 20 percent of all California wrongful convictions result from false jailhouse informant testimony); R. Warden, Northwestern University School of Law, Center on Wrongful Convictions, "The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row" (2004), available at www.law.northwestern.edu/wrongfulconvictions/issues/causesandremedies/snitches/SnitchSystemBooklet.pdf, p. 3 (last visited July 6, 2009) (testimony by jailhouse informants is leading cause of wrongful convictions in United States capital cases).

[9] See also R. Warden, Northwestern University School of Law, Center on Wrongful Convictions, "The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row" (2004), available at www.law.northwestern.edu/wrongfulconvictions/issues/causesandremedies/snitches/SnitchSystemBooklet.pdf, p. 15 (last visited July 6, 2009) ("[T]he snitch system sometimes operates on implicit promises. Even absent a formal understanding, the reward inevitably comes—because failing to deliver in one case would chill prospective future snitches."); S. Skurka, "A Canadian Perspective on the Role of Cooperators and Informants," 23 Cardozo L. Rev. 759, 766 (2002) ("[J]ailhouse informant is a term that conveniently captures a number of factors that are highly relevant to the need for caution. These include the facts that the jailhouse informant is already in the power of the state, is looking to better his or her situation in a jailhouse environment where bargaining power is otherwise hard to come

several commentators have pointed out that jailhouse informants frequently have motives to testify falsely that may have nothing to do with the expectation of receiving benefits from the government.[10]

In light of this growing recognition of the inherent unreliability of jailhouse informant testimony, we are persuaded that the trial court should give a special credibility instruction to the jury whenever such testimony is given, regardless of whether the informant has received an express promise of a benefit.[11] As we indi-

by, and will often have a history of criminality." [Internal quotation marks omitted.]); V. Wefald, "Watch Out! How Prosecutors and Informants Use Winking and Nodding to Try to Get Around *Brady* and *Giglio*," 58 Guild Practitioner 234, 239–40 (2001) ("once the informant has finished testifying that he has not been promised anything . . . the prosecutor *must* go about getting the informant what he wants or 'risk' the informant 'recanting' his testimony" [emphasis in original]); C. Zimmerman, "Toward a New Vision of Informants: A History of Abuses and Suggestions for Reform," 22 Hastings Const. L. Q. 81, 144 (Fall 1994) ("[t]he [police] handler has no desire and sees little benefit in formalizing the informant relationship").

[10] See S. Skurka, "A Canadian Perspective on the Role of Cooperators and Informants," 23 Cardozo L. Rev. 759, 762–63 (2002) ("jailhouse informants are almost invariably motivated by self-interest and . . . historically such evidence has been shown to be untruthful and to produce miscarriages of justice"); J. Call, "Legal Notes," 22 Just. Syst. J. 73, 74 (2001) ("[b]ecause jailhouse informants are already incarcerated, they are likely to feel that they have nothing to lose and much to gain by providing information to the government"); C. Sherrin, "Jailhouse Informants in the Canadian Criminal Justice System, Part II: Options for Reform," 40 Crim. L. Q. 157, 172–73 (1997) ("what may seem trivial to those on the outside, may still act as an invitation to perjury to those on the inside"); C. Zimmerman, "Toward a New Vision of Informants: A History of Abuses and Suggestions for Reform," 22 Hastings Const. L. Q. 81, 139 (1994) (informant's motivations for testifying "can include . . . some emotional impetuses . . . [such as] the thrill of playing detective, fear, and survival").

[11] One other state court also has reached this conclusion. See *Dodd* v. *State*, 993 P.2d 778, 784 (Okla. Crim. App. 2000); see also *State* v. *Grimes*, 295 Mont. 22, 31, 982 P.2d 1037 (1999) ("when a government informant motivated by personal gain rather than some independent law enforcement purpose provides testimony, a cautionary instruction is the more prudent course of action"), citing *People* v. *Dela Rosa*, 644 F.2d 1257, 1259 (9th Cir. 1980) ("courts have long recognized that the definition of an informer includes persons who provide evidence against a defendant for some personal advantage or vindication, as well as for pay or immunity"); cf. *People*

cated in *Patterson*, the trial court should instruct the jury that the informant's testimony must "be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 465; id., 470 (defendant was entitled to instruction "substantially in accord with the one that he had sought"). In addition, the trial court may ask the jury to consider: the extent to which the informant's testimony is confirmed by other evidence; the specificity of the testimony; the extent to which the testimony contains details known only by the perpetrator; the extent to which the details of the testimony could be obtained from a source other than the defendant; the informant's criminal record; any benefits received in exchange for the testimony; whether the informant previously has provided reliable or unreliable information; and the circumstances under which the informant initially provided the information to the police or the pros-

v. *Payton*, 3 Cal. 4th 1050, 1059 and n.2, 839 P.2d 1035, 13 Cal. Rptr. 2d 526 (1992) (trial court was not required to give cautionary instruction on jailhouse informant sua sponte, but state statute enacted after trial requires trial court to give cautionary instruction upon request); but see *United States* v. *Brooks*, 928 F.2d 1403, 1409 (4th Cir.) ("informer cautionary instruction is only appropriate when the individual supplying the information generally is either paid for his services or, having been a participant in the unlawful transaction, is granted immunity in exchange for his testimony" [internal quotation marks omitted]), cert. denied, 502 U.S. 845, 112 S. Ct. 140, 116 L. Ed. 2d 106 (1991); *State* v. *Saenz*, 271 Kan. 339, 348, 22 P.3d 151 (2001) (cautionary instruction is required only when informant acted as agent of state); *West* v. *Commonwealth*, 161 S.W.3d 331, 336 (Ky. App. 2005) (cautionary instruction on jailhouse informant testimony not required); *Moore* v. *State*, 787 So. 2d 1282, 1287 (Miss. 2001) (although trial court is not required to give cautionary instruction if jailhouse informant did not receive benefit in exchange for testifying, court recognizes that jailhouse informant testimony "is becoming an increasing problem in this state, as well as throughout the American criminal justice system" and court "does not view inmate testimony favorably" [internal quotation marks omitted]); *Lovitt* v. *Warden*, 266 Va. 216, 252, 585 S.E.2d 801 (2003) (Virginia "does not require a fact finder to give different consideration to the testimony of a government informant than to the testimony of other witnesses"), cert. denied, 541 U.S. 1006, 124 S. Ct. 2018, 158 L. Ed. 2d 523 (2004).

ecutor, including whether the informant was responding to leading questions.[12]

Having concluded that the defendant in the present case was entitled to this cautionary instruction, we must next determine whether the trial court's denial of the defendant's request for such an instruction was harmful. "[A]n instructional error relating to general principles of witness credibility is not constitutional in nature. . . . Consequently, the defendant bears the burden of establishing that the error [was harmful] . . . ." (Citation omitted.) Id., 471–72. "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Snelgrove*, 288 Conn. 742, 758, 954 A.2d 165 (2008). "Several factors guide our determination of whether the trial court's failure to give the requested instruction was harmful. These considerations include: (1) the extent to which [the jailhouse informant's] apparent motive for falsifying his testimony was brought to the attention of the jury, by cross-examination or otherwise; (2) the nature

---

[12] In *Dodd* v. *State*, 993 P.2d 778, 784 (Okla. Crim. App. 2000), the court required that the following instruction be given: "The testimony of an informer who provides evidence against a defendant must be examined and weighed by you with greater care than the testimony of an ordinary witness. Whether the informer's testimony has been affected by interest or prejudice against the defendant is for you to determine. In making that determination, you should consider: (1) whether the witness has received anything (including pay, immunity from prosecution, leniency in prosecution, personal advantage, or vindication) in exchange for testimony; (2) any other case in which the informant testified or offered statements against an individual but was not called, and whether the statements were admitted in the case, and whether the informant received any deal, promise, inducement, or benefit in exchange for that testimony or statement; (3) whether the informant has ever changed his or her testimony; (4) the criminal history of the informant; and (5) any other evidence relevant to the informer's credibility." (Internal quotation marks omitted.) See also M. Raeder, A. Taslitz & P. Giannelli, "Convicting the Guilty, Acquitting the Innocent–Recently Adopted ABA Policies," 20 Crim. Just. 14, 22 (2006); S. Skurka, "A Canadian Perspective on the Role of Cooperators and Informants," 23 Cardozo L. Rev. 759, 763 (2002).

of the court's instructions on witness credibility; (3) whether [the informant's] testimony was corroborated by substantial independent evidence; and (4) the relative importance of [the informant's] testimony to the state's case." *State* v. *Patterson,* supra, 276 Conn. 472. We address each factor in turn.

With respect to the first factor, the state claims that defense counsel cross-examined both Moran and Avery extensively as to their motive for testifying and addressed their incentive to lie in closing argument. Indeed, the defendant concedes that the jury "was aware that [the] informants . . . both hoped for and anticipated a benefit from the [s]tate when they made their statements to the police upon which their testimony was based. The desired benefits were expressed both during direct and cross-examination."

With respect to the second factor, the trial court instructed the jurors that, in determining whether a witness was credible, it should consider whether the witness had "an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case." As in *State* v. *Patterson,* supra, 276 Conn. 472, these instructions "were not extensive, and they contained no reference to [the informants] specifically." Unlike *Patterson,* however, the trial court instructed the jury that Moran and Avery had been convicted of prior felonies and that the jury "may consider that everything else being equal, you would not believe the testimony of a person who has committed a serious crime as readily as you would a person of good character. However, you are not required to disbelieve a witness because he has been previously convicted of a felony." Thus, the jury was specifically instructed that it should subject Moran's and Avery's testimony to greater scrutiny than the testimony of an ordinary witness.

With respect to the third and fourth factors, the state claims that the evidence strongly supported the defendant's conviction even without the informants' testimony. It points out that the defendant's neighbor, Smith, testified that, several hours after the defendant told him that he was going on a "mission," the defendant called him and told him that he had something that Smith might be interested in buying. Smith went to the defendant's residence and the defendant showed him a handgun. Several days later, Smith went to the defendant's residence again and the defendant showed him a cash register. The defendant told Smith that the cash register was "from his mission . . . ." During a later conversation, the defendant told Smith that "things went bad when he went to do the mission" and "[t]he old man got killed." The defendant's accomplice, Perry, admitted that he had been present at the scene of the murder and testified that the defendant shot Caruso after accusing Caruso of shortchanging him.[13]

The state also presented as evidence the defendant's written statements to the police, in which he denied that he had been present in the liquor store when Caruso was murdered, but admitted that Perry had brought the cash register to his residence on the day of the murder and that he had hidden it behind a dresser in his bedroom. The defendant also stated that he had pried the cash register open with a screwdriver and that he and Perry had shared the money. The defendant later attempted to remove his fingerprints from the cash register. He further admitted that he and Perry had sold the murder weapon to a drug dealer and that they had split the proceeds.

---

[13] The trial court instructed the jury that, in considering accomplice testimony, the jury should consider the possibility that the accomplice was hoping for favorable treatment from the state and might have an interest in the outcome of the case.

Finally, the state presented evidence at trial that a jacket that had been seized from the defendant's residence was contaminated with Mace, which Caruso had sprayed at his attackers. A chemist employed by the state forensic laboratory testified that the Mace was in the form of droplets, not smears, and, therefore, could not have been transferred to the jacket from the cash register, as the defendant had claimed in one of his statements to the police.

We conclude that all four factors support a conclusion that the trial court's denial of the defendant's request for a jailhouse informant instruction regarding the testimony of Moran and Avery could not have substantially affected the verdict. The jury was made aware of the fact that the informants hoped for a benefit from the state, the court specifically instructed the jury that their testimony should be considered with caution because they were convicted felons and there was strong evidence to support the conviction even without the informants' testimony. Even if Smith's testimony was not a model of consistency and clarity,[14] the defendant has not identified any motive for Smith to have lied about the defendant's involvement in the murder. Although Perry had a motive to testify falsely about the defendant's involvement, his testimony was not incredible as a matter of law.[15] Moreover, the jury reasonably could have believed Perry's testimony that the defendant had participated in the robbery even if it was unsure about Perry's testimony that the defendant had shot Caruso. Finally, the presence of the cash register

---

[14] The defendant points out that Smith was an admitted drug dealer and claims that Smith's testimony was inconsistent with his statement to the police, with crime scene evidence and with the testimony of other witnesses.

[15] The defendant claims that Perry's testimony was incredible because he previously had given four inconsistent statements to the police and he admitted at trial that he had lied in all of them.

and the jacket contaminated by Mace[16] at the defendant's house, and Perry's willingness to share the proceeds from the robbery and from the sale of the murder weapon with him, all constituted strong evidence that the defendant had participated in the robbery. Accordingly, we conclude that the trial court's denial of the defendant's request for a special credibility charge was harmless and affirm the judgment of the Appellate Court on this alternate ground.

## II

We next address the defendant's claim that the Appellate Court improperly concluded that the trial court properly denied his motion for judgment of acquittal on the felony murder charge. The defendant claims that the conviction on that charge was legally inconsistent with the verdict of acquittal on the underlying felony of robbery in the first degree. The state disputes this claim and claims as an alternate ground for affirmance that this court, in the exercise of its supervisory powers over the administration of criminal justice, should adopt the rule in *United States* v. *Powell*, supra, 469 U.S. 69, that claims of legal inconsistency between a conviction and an acquittal are not reviewable. We agree with the state's alternate ground for affirmance.

The resolution of this question requires an in-depth review of the development of our jurisprudence govern-

[16] The defendant points out that he told the police that, on the night of the murder, he had worn a black nylon jacket that "zipped up the front." Three black jackets were seized from the defendant's residence, one of which had a partial front zipper and two of which had full zippers. The Mace was found on the jacket with the partial zipper. The defendant contends that that jacket did not constitute substantial evidence of his guilt because it did not have a full zipper, his DNA was not found on it and the issue of which of the three jackets he had been wearing on the night of the murder was "highly contested" at trial. We disagree. It would have been entirely reasonable for the jury to conclude that it was not a mere coincidence that one of the defendant's black, zippered nylon jackets was contaminated with Mace.

ing inconsistent verdicts. In *State* v. *Whiteside*, 148 Conn. 208, 209–10, 169 A.2d 260, cert. denied, 368 U.S. 830, 82 S. Ct. 52, 7 L. Ed. 2d 33 (1961), the defendant was charged in a twenty-three count information with having published a series of libels, but was convicted of only four counts. On appeal, he claimed that his conviction on count twelve should be set aside because "he was found not guilty on a number of counts in which he was charged with publishing, on other dates, defamatory matter similar to that charged in count [twelve] and concerning the same persons." Id., 214. This court stated that "[e]ach count in the information charged a separate and distinct offense and was complete in itself. The only question is whether the evidence was sufficient to support a conviction on count [twelve], irrespective of the verdict on the other counts." Id. Because the defendant had not challenged the sufficiency of the evidence on count twelve, "[t]here was no basis for the court to disturb the verdict on that count." Id.

In *State* v. *Keating*, 151 Conn. 592, 593–94, 200 A.2d 724 (1964), cert. denied sub nom. *Joseph* v. *Connecticut*, 379 U.S. 963, 85 S. Ct. 654, 13 L. Ed. 2d 557 (1965), the two appealing defendants had been convicted of conspiracy. They had been tried with three other individuals, two of whom also had been convicted of conspiracy and one of whom had been acquitted. Id., 594. On appeal, the appealing defendants claimed that their convictions were inconsistent with the acquittal of their codefendant. Id. This court noted that, although the defendants had not claimed in their "common assignment of error" that the guilty verdicts were not supported by the evidence, "the briefs of both the [defendants] and the state argue inconsistency as a question of fact and refer to the evidence offered at the trial." Id., 595. Because the defendants had failed to file a transcript of the trial court proceedings, however,

this court concluded that "there [was] nothing in the record from which this court can determine whether or not the verdict was inconsistent as a matter of fact." Id. Accordingly, this court declined to consider whether it should adopt "the rule of such cases as *United States* v. *Austin-Bagley* [*Corp.*], 31 F.2d 229, [233] (2d Cir.), cert. denied, 279 U.S. 863, 49 S. Ct. 479, 73 L. Ed. 1002 [1929] . . . ."[17] *State* v. *Keating*, supra, 595–96. This court also concluded that, "[s]trictly as a matter of law on the record, there [was] no inconsistency in the verdict"; id., 596; because "[t]here [was] nothing in the information to indicate that the acquittal of any one or more of the persons accused is inconsistent with a finding of guilt on the part of another accused." Id. Therefore, the court did not address the question of whether a legal inconsistency between a conviction and an acquittal was permissible.

In *State* v. *Manning*, 162 Conn. 112, 114, 291 A.2d 750 (1971), the defendant had been acquitted of four counts of indecent assault on a child and convicted of four counts of injury or risk of injury to a child in connection with the same conduct. On appeal, he claimed that the trial court improperly had denied his request to set aside the guilty verdicts because they were inconsistent with the acquittals. Id., 121–22. In response to this claim, this court stated that "[c]onsistency in the verdict is not necessary." (Internal quotation marks omitted.) Id., 122, quoting *Dunn* v. *United States*, 284 U.S. 390, 393, 52 S. Ct. 189, 76 L. Ed. 356 (1932). We emphasized that, under *Whiteside*, the dispositive question was whether there was sufficient evi-

[17] In *Austin-Bagley Corp.*, the United States Court of Appeals for the Second Circuit concluded that, even if the defendants could not have been engaged in a conspiracy unless their acquitted codefendants also were engaged in it, a "rational inconsistency" in the verdicts would not require reversal of the convictions when there was no "indication that the jury was improperly moved to convict . . . ." *United States* v. *Austin-Bagley Corp.*, supra, 31 F.2d 233.

dence to support the conviction. *State* v. *Manning*, supra, 122. We then noted, however, that the test for setting aside a verdict was "whether the jury could reasonably and logically have reached the conclusion which they did"; id., 122–23; and stated that, "[w]hile an inconsistent verdict is not objectionable in itself, its inconsistency may be considered insofar as it supports a claim that the jury's conclusion was not reasonably and logically reached." Id., 123. We concluded that, because, as in *Keating*, the defendant had filed no appendix with his brief, there was "no basis on which to determine whether the verdict was inconsistent as a matter of fact." Id. Moreover, because the counts on which the defendant had been convicted and those on which he had been acquitted contained different elements, we concluded that "a conviction of one crime is not inconsistent on its face with an acquittal on the other." Id., 124. Accordingly, this court again did not directly address the question of whether a facially, or legally, inconsistent verdict would be permissible.

In *State* v. *Rosado*, 178 Conn. 704, 705, 425 A.2d 108 (1979), the defendant was convicted of sale of narcotics and acquitted of possession of narcotics. On appeal, the defendant claimed that "the verdict of the jury acquitting him of the crime of possession is, on the facts of the present case, necessarily inconsistent with the verdict of guilty of the crime of sale and therefore the conviction on the first count must be set aside." Id., 708. This court stated that "inconsistency of the verdicts is immaterial. . . . As Justice Holmes long ago observed in the case of *Dunn* v. *United States*, [supra, 284 U.S. 393–94]: The most that can be said in such cases . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power

which they had no right to exercise, but to which they were disposed through lenity. . . . That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (Citations omitted; internal quotation marks omitted.) *State* v. *Rosado*, supra, 708–709. Accordingly, we rejected the defendant's claim. Id., 709–10; see also *State* v. *Martin*, 189 Conn. 1, 6, 454 A.2d 256 (reversing trial court's decision setting aside conviction of risk of injury to child on ground that it was inconsistent with acquittal on assault charge because consistency in verdict is not necessary under *Rosado*), cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983); *State* v. *Morgan*, 179 Conn. 617, 620 n.2, 427 A.2d 429 (1980) (rejecting defendant's claim that verdicts were logically inconsistent because inconsistent verdicts are permissible under *Dunn*).

In *State* v. *DeCaro*, 252 Conn. 229, 231, 745 A.2d 800 (2000), the defendant was convicted of nine counts of forgery and acquitted of three counts of larceny. On appeal, she claimed that the verdicts were inconsistent. Id., 242. Citing the same language that this court had used in *State* v. *Rosado*, supra, 178 Conn. 708–709, this court stated that "a factually inconsistent verdict will not be overturned on appeal." *State* v. *DeCaro*, supra, 242. Nevertheless, this court then addressed the defendant's claim, brought pursuant to *Manning*, that "her conviction on the forgery charges *logically* cannot be squared with her acquittal on the larceny charges," and apparently assumed, without deciding, that her claim that the jury logically could not have concluded that the evidence was insufficient to support the larceny charge while concluding that it was sufficient to support the forgery charge was somehow distinct from a claim of factual inconsistency.[18] (Emphasis in original). Id.,

---

[18] We stated in *DeCaro* that, "[d]espite our settled law regarding the validity of factually inconsistent verdicts, the defendant appears to argue that, in

243, quoting *State* v. *Manning,* supra, 162 Conn. 123 ("[w]hile an inconsistent verdict is not objectionable in itself, its inconsistency may be considered insofar as it supports a claim that the jury's conclusion was not reasonably and logically reached" [internal quotation marks omitted]). This court concluded that, even assuming that the evidence was insufficient to support a finding that she had altered the documents with intent to defraud, deceive or injure another, as required under the larceny statute, the evidence was sufficient to establish that the defendant had committed forgery by altering public documents in an effort to conceal her inadequate accounting and record keeping. Accordingly, we concluded that the verdict was not logically inconsistent. *State* v. *DeCaro,* supra, 243. In addition, because the elements of the crimes were different, we concluded that the verdict was not legally inconsistent. Id., 245; see also *State* v. *Knight,* 266 Conn. 658, 673–74, 835 A.2d 47 (2003) (assuming, without deciding, that legally inconsistent, factually inconsistent and logically inconsistent verdicts may be treated differently and concluding that logically inconsistent verdicts by separate fact finders are permissible).

Thus, *Manning* and a number of later cases have recognized three types of claims involving an inconsistency between a conviction and an acquittal: (1) claims of factual inconsistency—i.e., claims that the jury found that evidence that was insufficient to support a set of

---

light of the state's theory of the case and the evidence adduced by the state in support thereof, her conviction on the forgery charges *logically* cannot be squared with her acquittal on the larceny charges." (Emphasis in original.) *State* v. *DeCaro,* supra, 252 Conn. 243; see also *State* v. *Knight,* 266 Conn. 658, 662, 671–74, 835 A.2d 47 (2003) (court addressed defendant's claim that trial court's verdict finding defendant guilty of criminal possession of firearm was logically inconsistent with jury's verdict, based on identical evidence, finding defendant not guilty of carrying pistol without permit without expressly considering whether claim was distinct from claim of factual inconsistency).

facts necessary to convict on one offense was sufficient to support the same set of facts necessary to convict on another offense—that are effectively not reviewable;[19] (2) claims of legal inconsistency—i.e., claims involving a conviction of one offense and an acquittal of a lesser included offense—which this court has assumed may result in a reversal of the conviction, without deciding that question; and (3) claims of a logical inconsistency between a conviction and an acquittal, which this court also has assumed may result in a reversal of the conviction, again without deciding that question. A careful review of our cases involving inconsistent verdicts, however, reveals that this classification is based on a misinterpretation of the earlier cases. In *Whiteside*, this court held *without qualification* that a factually inconsistent verdict could not be set aside unless the conviction was not supported by sufficient evidence. *State* v. *Whiteside*, supra, 148 Conn. 214; see also *State* v. *Martin*, supra, 189 Conn. 6; *State* v. *Morgan*, supra, 179 Conn. 620 n.2; *State* v. *Rosado*, supra, 178 Conn. 708–709. In *Keating*, this court did not mention *Whiteside*, but appeared to assume that whether either a factually or legally inconsistent verdict must be set aside was an open question.[20] *State* v. *Keat-*

[19] See *Brown* v. *State*, 182 Md. App. 138, 156 n.10, 957 A.2d 654 (2008) ("[a] factually inconsistent verdict is one where a jury renders different verdicts on crimes with distinct elements when there was only one set of proof at a given trial, which makes the verdict illogical, while a legal inconsistency, by contrast, occurs when an acquittal on one charge is conclusive as to an element which is necessary to and inherent in a charge on which a conviction has occurred" [internal quotation marks omitted]). In *Price* v. *State*, 405 Md. 10, 949 A.2d 619 (2008), the concurring justice provided the following example of a factually inconsistent verdict: "Assume a legally intoxicated or otherwise reckless driver causes a head-on collision, killing on impact the driver and passenger of the other car. The intoxicated driver is charged with two counts of vehicular homicide. The jury convicts the defendant of vehicular homicide as to the death of the driver of the other car, but finds the defendant not guilty of the same crime with regard to the death of the passenger. Such a result would constitute factually inconsistent verdicts." Id., 36 (*Harrell, J.*, concurring).

[20] This may be because *Keating* involved inconsistent verdicts among

*ing*, supra, 151 Conn. 595–96. Because the court concluded that the verdict was neither factually nor legally inconsistent, it did not address the question of whether either type of inconsistency would require reversal of the conviction. Id.

In *Manning*, this court recognized the general rule that "[c]onsistency in the verdict is not necessary"; (internal quotation marks omitted) *State* v. *Manning*, supra, 162 Conn. 122; but also held that "[w]hile an inconsistent verdict is not objectionable in itself, its inconsistency may be considered insofar as it supports a claim that the jury's conclusion was not reasonably and logically reached." Id., 123. In reaching this conclusion, this court first referred to language from a number of cases in which the defendant sought to set aside the verdict for insufficiency of the evidence stating that, in reviewing such claims, "we decide only whether the jury could reasonably and logically have reached the conclusion which they did. *Akers* v. *Singer*, 158 Conn. 29, 32, 255 A.2d 858 [1969]; *Conti* v. *Brown*, 149 Conn. 465, 467, 181 A.2d 591 [1962]; *Desmarais* v. *Pinto*, 147 Conn. 109, 110, 157 A.2d 596 [1960]." *State* v. *Manning*, supra, 122–23. This court then assumed that that standard had been applied in *Keating*. Id., 123. In *Keating*, however, this court had merely recognized that a verdict may be inconsistent either factually or legally and assumed, without deciding, that an inconsistent verdict could be set aside. *State* v. *Keating*, supra, 151 Conn. 596. We did not suggest in *Keating* that, even if an inconsistent verdict was "not objectionable in itself, its inconsistency may be considered insofar as it supports

coconspirators, and not, as in *Whiteside*, inconsistent verdicts involving a single defendant. This court may have assumed that *Whiteside* did not apply to inconsistent verdicts among multiple defendants. See *State* v. *Stevens*, 178 Conn. 649, 654, 425 A.2d 104 (1979) (distinguishing factually inconsistent verdicts from verdicts "based on a legal impossibility [e.g., conviction of one defendant and acquittal of the other in a joint trial of two alleged co-conspirators]").

a claim that the jury's conclusion was not reasonably and logically reached." *State* v. *Manning*, supra, 123. Indeed, the only reason that we can perceive that an inconsistency between a conviction and an acquittal might be objectionable in the first instance is that the inconsistency suggests that the verdict was "not reasonably and logically reached." Id.; see *Brown* v. *State*, 182 Md. App. 138, 156 n.10, 957 A.2d 654 (2008) ("[a] factually inconsistent verdict is one where a jury renders different verdicts on crimes with distinct elements when there was only one set of proof at a given trial, which makes the verdict illogical" [internal quotation marks omitted]). Because inconsistent verdicts are generally permissible and are inherently illogical, we have difficulty understanding why an inconsistent verdict would not be permissible if the inconsistency supported a claim that the jury had acted illogically. Such an exception would entirely swallow the rule. We further note that, although this court assumed without deciding in *DeCaro* and *Knight* that factually, legally and logically inconsistent verdicts should be treated differently and that legally or logically inconsistent verdicts may be set aside, this court never has set aside a verdict on the ground that a conviction on one charge was legally or logically inconsistent with an acquittal on another charge.

Accordingly, we now repudiate our suggestion in *Manning* that an inconsistent verdict may be reversed if it supports a finding that the jury acted unreasonably or illogically and reaffirm our holdings in *Whiteside* and *Rosado* that factually and logically inconsistent verdicts are permissible. We also now address the question that we avoided in *Keating, Manning* and *DeCaro*—namely, whether legally inconsistent verdicts are permissible— and answer that question in the affirmative.[21] In reach-

---

[21] We emphasize that our holding is limited to cases involving an apparent inconsistency between *a conviction and an acquittal* and does not apply to inconsistent *convictions*. See, e.g., *State* v. *Hinton*, 227 Conn. 301, 311–18,

ing this conclusion, we are persuaded by the decision of the United States Supreme Court in *United States* v. *Powell,* supra, 469 U.S. 62, in which the court reaffirmed its holding in *United States* v. *Dunn,* supra, 284 U.S. 393, that "[c]onsistency in the verdict is not necessary." (Internal quotation marks omitted.) In *Powell,* the defendant argued that *Dunn* did not apply in cases in which the defendant was convicted of a compound offense but was acquitted of a predicate offense. *United States* v. *Powell,* supra, 60 (defendant contended that, because conspiracy to possess cocaine with intent to distribute was element of "telephone facilitation,"

---

630 A.2d 593 (1993); see also *United States* v. *Powell,* supra, 469 U.S. 69 n.8 ("[n]othing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other"). In *Ex parte State,* Supreme Court of Alabama, Docket No. 1060203 (June 13, 2008), the Supreme Court of Alabama explained the difference between cases involving an inconsistency between a conviction and an acquittal and cases involving an inconsistency between convictions as follows: "[M]utually exclusive [convictions] are the result of two positive findings of fact that cannot logically coexist. In other words, it is legally impossible for the [s]tate to prove the elements of both crimes. . . . Mutually exclusive [convictions] exist when a guilty verdict on one count logically excludes a guilty verdict on another count. In contrast, inconsistent verdicts can exist where there is a verdict of guilty and another of not guilty . . . ." The Alabama court further explained that, for the reasons set forth in *Powell,* the court "will not disturb guilty verdicts on the basis of apparent inconsistencies [between a conviction and an acquittal] so long as there is sufficient evidence to support the [conviction]. However, mutually exclusive [convictions] are contradictory and cannot be reconciled. [Convictions] are mutually exclusive if the existence of any of the elements of one offense negates the existence of any of the elements for another offense of which the defendant also stands convicted." Id.

We also express no opinion as to whether factually or legally inconsistent verdicts in cases tried solely to the court are permissible. See *State* v. *Knight,* supra, 266 Conn. 671–72 (stating in dictum that rationale for permitting inconsistent jury verdicts does not apply to inconsistent verdicts rendered by judge).

Finally, our holding in the present case does not apply to civil cases. See *Kregos* v. *Stone,* 88 Conn. App. 459, 470, 872 A.2d 901 (in civil cases, "[a] verdict that is inconsistent or ambiguous should be set aside"), cert. denied, 275 Conn. 901, 882 A.2d 672 (2005).

acquittal on former charge mandated acquittal on latter charge). The United States Supreme Court rejected this claim. The court reasoned that "inconsistent verdicts . . . should not necessarily be interpreted as a windfall to the [g]overnment at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.[22] But in such situations the [g]overnment has no recourse if it wishes to correct the jury's error; the [g]overnment is precluded from appealing or otherwise upsetting such an acquittal by the [c]onstitution's [d]ouble [j]eopardy [c]lause." Id., 65. "The fact that the inconsistency may be the result of lenity, coupled with the [g]overnment's inability to invoke review, suggests that inconsistent verdicts should not be reviewable." Id., 66.

The court in *Powell* also noted that "an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." Id. Finally, the court recognized that "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." Id., 67. Because this reasoning is consistent with our decisions in *Whiteside* and *Rosado*, we find it persuasive. See *State* v. *Gaston*, 198 Conn. 490, 492–93, 503 A.2d 1157 (1986) (agreeing, in dictum, with court's holding in *Powell* that inconsistent verdicts are not reviewable); *State* v. *Cassidy*, 3 Conn. App. 374, 389, 489 A.2d 386 (rejecting, under *Powell*, "defendant's argument that reviewability depends on a distinction between factual

---

[22] Of course, if there is evidence that the jury reached an inconsistent verdict as the result of juror misconduct, *Powell* would not bar review of that claim.

and legal inconsistency"), cert. denied, 196 Conn. 803, 492 A.2d 1239 (1985). Accordingly, we conclude that claims of legal inconsistency between a conviction and an acquittal are not reviewable.[23] We therefore affirm the decision of the Appellate Court that the trial court properly denied the defendant's motion for acquittal on this alternate ground.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[23] Most state courts follow this approach. See 6 W. LaFave, J. Israel & N. King, Criminal Procedure (3d Ed. 2007) § 24.10 (b), p. 549.