******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JAYEVON BLAINE
(AC 36832)

Beach, Sheldon and Prescott, Js.

*Argued January 19—officially released September 27, 2016*

(Appeal from Superior Court, judicial district of
Fairfield, Kahn, J.)

*Katherine C. Essington*, assigned counsel, for the
appellant (defendant).

*Adam E. Mattei*, assistant state's attorney, with
whom, on the brief, were *John C. Smriga*, state's attor-
ney, and *Howard S. Stein*, senior assistant state's attor-
ney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Jayevon Blaine, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2).[1] On appeal, the defendant claims that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred in denying his request for a jury instruction on third party culpability; and (3) the court incorrectly instructed the jury on the requisite intent to find him guilty of conspiracy to commit robbery in the first degree. We affirm the judgment of the trial court.

Evidence supporting the following facts was presented to the jury. On September 6, 2009, at approximately 9:35 p.m., Bridgeport police Officer Paul Scillia was dispatched to Bretton Street in Bridgeport to respond to reports of gunshots and a suspicious vehicle. Upon arrival, he observed the victim, later identified as Kevin Soler, lying in the backseat of a vehicle, with his legs hanging out of an open door. Scillia checked the victim for a pulse and determined that he was deceased. He radioed for backup.

Soon after the other officers arrived at the scene, Scillia and the other officers were approached by Priscilla LaBoy. She was crying hysterically. LaBoy told Scillia that the deceased person in the car was her boyfriend. She told Scillia that the victim had picked her up earlier in the day and that they met a friend of his.[2] The three drove to a designated location where they parked and waited for another person. After they waited there for a couple of minutes, a black male, approximately six feet tall and wearing a black hoodie, approached their vehicle from across the street. The victim exited his vehicle and met the other man in the middle of the street. LaBoy overheard Soler, who sounded anxious, tell the other man that they had met each other at the other man's "baby mama's party." LaBoy told Scillia that the other man then shot her boyfriend.

Police investigators at the scene found a cell phone belonging to Robert Taylor, who had been the third person in the car; an examination of the cell phone led the police to Jihad Clemons. The police questioned Clemons, who said the defendant was the shooter. Two days later, police executed a warrant for the arrest of the defendant on other charges. The defendant lived at the time with DeAndre Harper and Harper's younger brother and sister, Sean Harper and Antonajia Pettway. In the course of executing the warrant, the police found two guns under a mattress, which Harper and his brother slept on; the defendant slept in the same small bedroom on a different mattress. One of the guns, a nine millimeter handgun, was determined by a firearms expert to have fired the bullet recovered from the vic-

tim's body. Further investigation led to the arrests of four people who, together with the defendant, were charged with, inter alia, conspiracy to commit robbery in the first degree.

All four of the defendant's coconspirators, Clemons, Craig Waddell, Hank Palmer, and Mike Lomax, who had known each other for several years but had only recently been introduced to the defendant, testified for the state at the defendant's trial. The crux of their testimony, as it related to the charge of conspiracy, was that they and the defendant had entered into an agreement to rob Robert Taylor, a drug dealer.

Clemons was the first of the conspirators to testify. He testified that on September 6, 2009, he and Waddell visited their friend, Braxton Gardner, and decided to buy some marijuana. To that end, Gardner made a phone call to Taylor, a drug dealer with whom he was familiar. Gardner met Taylor a block or two from his house and completed the purchase. Clemons, Waddell, and Gardner smoked the marijuana that they had purchased, and then Gardner left to attend his younger brother's football game.

Shortly thereafter, Clemons and Waddell decided that they wanted more marijuana, so they called Gardner to get Taylor's telephone number. Clemons then called Taylor, who met them near Gardner's house and sold them more marijuana. While Clemons and Waddell were smoking the newly purchased marijuana, they walked to Palmer's house and discussed robbing Taylor. Lomax arrived at Palmer's house, and the four men discussed their plan to rob Taylor.

Clemons, Waddell, and Lomax left Palmer's house—leaving Palmer behind—and drove Lomax's car, a white Honda, to Harper's house to ask Harper if he would like to be involved in their planned robbery of Taylor. They found Harper outside on his porch with his cousin, the defendant. Harper and the defendant approached Lomax's vehicle, where they discussed the robbery. Clemons, Waddell, and Lomax first asked Harper if he wanted to participate in the robbery, but Harper declined. They then asked the defendant if he wanted to participate, and he agreed to do so. The defendant got into Lomax's vehicle, and the four men returned to Palmer's house.

When they arrived at Palmer's house, the five men spent forty-five minutes further discussing their plan to rob Taylor. They agreed that Clemons would call Taylor to set up a meeting and that the defendant would rob him using a nine millimeter handgun, while Waddell stood nearby. Lomax would drive the car to the place of the meeting, and Palmer would stay in the car with Lomax. They agreed that they would steal Taylor's drugs, car, and cell phone.

At some point after dark, the men went to meet Tay-

lor. Taylor had told Clemons that he was running late because he had a flat tire. Clemons parted company with the others to go home because he was late for his curfew. Meanwhile, as noted previously in this opinion, Taylor got a ride to the rendezvous with his friend, Soler, and Soler's girlfriend, LaBoy. Soler parked at the agreed upon location, and a person appeared; Soler and the person conversed because Soler had agreed to conclude the sale on Taylor's behalf. The other person then shot Soler. Taylor ran from the scene and dropped his cell phone; other shots were fired at Taylor.

Clemons later called Harper to try to get in touch with the defendant. Clemons testified that he called Harper's phone and the defendant answered. Clemons "asked him what happened, and he said he killed one of them and one of them tried to run and I guess he shot at them and that was it." The defendant also admitted to Pettway that he shot someone; and Waddell, who had been in the vicinity of the shooting but was not immediately with the defendant at the time, told Lomax and Palmer that the defendant had shot someone.

I

The defendant first claims that the evidence was insufficient to sustain his conviction of conspiracy to commit robbery in the first degree. We disagree.

"The two part test this court applies in reviewing the sufficiency of the evidence supporting a criminal conviction is well established. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767, 36 A.3d 670 (2012).

"To establish the crime of conspiracy, it must be shown that an agreement was made to engage in conduct constituting a crime, that the conspirators intended that the conduct be performed and that the agreement was followed by an overt act in furtherance of the conspiracy. . . . Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Palangio*, 115 Conn. App. 355, 362, 973 A.2d 110, cert. denied, 293 Conn. 919, 979 A.2d 492 (2009); see also General Statutes § 53a-48.

A person is guilty of the crime of robbery in the first degree, as defined in § 53a-134 (a), when "in the course

of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon. . . .'' General Statutes § 53a-133 provides: ''A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.''

There can be no doubt that the evidence was more than sufficient to sustain the conviction. Clemons, Waddell, Palmer, and Lomax all testified that they, together with the defendant, devised the plan to rob Taylor. They testified about the steps that they took to execute the plan. The defendant was to be the gunman and Waddell the backup. In this case, there was direct testimony about the planning to rob Taylor with the use of a firearm.

The defendant's sole attack on the sufficiency of the evidence appears to be limited to his assertion that by finding him not guilty of murder, felony murder and attempted robbery, the jury necessarily rejected the state's theory that he was the shooter. If evidence that he was the shooter was not credited, the defendant argues, there was no other evidence on which the conspiracy conviction could be based. He contends, then, that the evidence did not support the conviction of conspiracy. We are not persuaded.

Our Supreme Court in *State* v. *Arroyo*, 292 Conn. 558, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), held that verdicts that are factually, legally, and/or logically inconsistent are permissible. The court reviewed prior cases and resolved any prior uncertainty in the law by holding that courts reviewing claims of inconsistent verdicts should examine only whether the evidence provided sufficient support for the conviction, and not whether the conviction could be squared with verdicts on other counts. Id., 575–83. The court noted that its holding was entirely consistent with *United States* v. *Powell*, 469 U.S. 57, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984). See *State* v. *Arroyo*, supra, 584–85.

The defendant argues that his claim is not an inconsistent verdict claim because he is claiming that the jury resorted to improper speculation and ''necessarily found facts that are not supported by any evidence in the record . . . .'' (Emphasis omitted.) He contends that the evidence suggests that he participated in the conspiracy only as the shooter; thus, he argues that, by finding him guilty of conspiracy to commit robbery but not guilty of the remaining offenses, the jury must have

based its verdict entirely on speculation. This argument, however, is simply another way to phrase a claim of inconsistency, and our Supreme Court in *Arroyo* specifically rejected the argument that a claim of inconsistency in verdicts may be considered on appeal under the alternative rubric that " 'the jury's conclusion was not reasonably and logically reached' "; *State* v. *Arroyo*, supra, 292 Conn. 580; because of inconsistency. See id., 580–83. The defendant concedes that there was evidence that he agreed to participate in the crime as the shooter; we agree. Because factually inconsistent verdicts are permissible, the claim is not reviewable. See id., 583.

II

The defendant next claims that the court erred by denying his request for a jury instruction regarding third party culpability. The state argues that any error in refusing to instruct the jury on third party culpability was harmless in the circumstances of this case. We agree with the state.

In *State* v. *Arroyo*, 284 Conn. 597, 935 A.2d 975 (2007), our Supreme Court addressed a similar scenario, in which evidence arguably supporting the defense of third party culpability had been admitted, but the trial court had refused to instruct the jury on the defense of third party culpability. Our Supreme Court noted that the rationale for providing an instruction was similar to the rationale for admitting such evidence initially: "In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence. . . .

"It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted; internal quotation marks omitted.) Id., 607–609.

The defendant filed a request for an instruction regarding third party culpability.[3] During the charging conference, defense counsel suggested that Harper was

the putative third party culprit and that the following evidence justified the instruction: Lomax testified that there was telephonic activity between the coconspirators and Harper before and after the incident; Clemons testified that he had told the police that the gun used in the incident was probably provided by Harper; and the murder weapon was found under Harper's bed.

The court ruled that the evidence did not warrant a third party culpability instruction. Relying on authority including *State* v. *Delossantos*, 211 Conn. 258, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989), the court noted that the only significant evidence implicating Harper was the fact that the gun used in the crime was found under his mattress, and that the defendant slept in the same room. The court discounted the evidence regarding the phone call to Harper after the shooting because the conspirators used that phone to try to reach the defendant. Noting that the defendant's attorney was free to argue that Harper was in fact the shooter, the court stated that there was no direct evidence that Harper was the shooter, in its view, and it was exercising its discretion not to give the charge.

The following additional facts are relevant. None of the four coconspirators testified that Harper had agreed to participate in the robbery, that he was at Palmer's house when the robbery was being planned or that he was present at the shooting incident. Clemons testified that he went to Harper's house and that he thought "Harper would be up for doing a robbery," but when Harper was asked to participate, he refused. Lomax testified that Harper was not "in the mix" of robbery participants. Waddell testified that the gun used in the robbery was originally procured by Lomax, but that "everybody used it as a community gun." Lomax testified that he had informed police that the gun belonged to Palmer. The weapon was found under Harper's mattress in a room that he shared with his younger brother and the defendant. Clemons testified that during an interview with police, he told them in the beginning of the interview that the gun used in the robbery belonged to Lomax and was kept at Palmer's house. He further testified that, although at the end of that interview with police he had stated that he probably got the gun from Harper's house, he had misspoken in so stating. Clemons testified that he went home before the shooting due to a curfew. Later that night he wanted to locate the defendant, who had not met with Lomax, Waddell and Palmer after the planned robbery, but, because he did not have the defendant's phone number, he called Harper's phone. He stated that the defendant answered Harper's telephone. Lomax testified on cross-examination that he "might have" called Harper's phone before and after the robbery, and on redirect examination testified that he had no recollection of making such calls.

The thrust of the defendant's argument in support of the requested charge at trial was that some evidence pointed to Harper's being the shooter. The defendant was found not guilty of all charges other than conspiracy, and there was neither evidence nor argument suggesting that the defendant could not have been a coconspirator if Harper had been the shooter.[4] Any error in refusing to give the charge, then, was harmless, because the jury's decision as to the conspiracy count logically could not have been affected by the giving of the requested charge. The issue is not constitutional in nature, and thus it is the defendant's burden to prove harmfulness. See *State* v. *Inglis*, 151 Conn. App. 283, 296–97, 94 A.3d 1204 (claim regarding denial of third party culpability instruction not of constitutional magnitude), cert. denied, 314 Conn. 920, 100 A.3d 851 (2014), cert. denied,    U.S.   , 135 S. Ct. 1559, 191 L. Ed. 2d 647 (2015).

We conclude that the standard for harmlessness was satisfied because we have "a fair assurance that the error did not substantially affect the verdict . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Arroyo*, supra, 284 Conn. 614. The testimony of Clemons, Waddell, Palmer, and Lomax supported the proposition that the defendant played a role in the conspiracy to commit robbery. Clemons and Lomax testified that they went to Harper's house, where the defendant resided, and Harper declined to participate in the robbery, but the defendant agreed. Clemons, Waddell, Palmer, and Lomax all testified that they, along with the defendant, discussed at Palmer's house their plan to commit the robbery later that day. There was strong evidence that the defendant participated in some capacity in the robbery. Even if the evidence that the gun used in the robbery was found under Harper's bed, in a room he shared with the defendant, and that there was telephonic communication between some of the coconspirators and Harper before and after the robbery, was believed to have linked Harper to the conspiracy, the defendant would not be exculpated from being a conspirator, nor would evidence that Harper was the shooter exculpate the defendant from being found guilty of conspiracy. Accordingly, any error was harmless.

### III

The defendant last claims that the court erred in declining to instruct the jury according to the principles set forth in *State* v. *Pond*, 138 Conn. App. 228, 50 A.3d 950 (2012), aff'd, 315 Conn. 451, 108 A.3d 1083 (2015); see *State* v. *Pond*, 315 Conn. 451, 466, 108 A.3d 1083 (2015) (Appellate Court properly determined that trial court should have instructed jury that "to find the defendant guilty of conspiracy to commit robbery in the second degree in violation of [General Statutes] §§ 53a-135 [a] [2] and 53a-48 [a], it had to find that the defendant

specifically intended that the robbery would involve the display or threatened use of . . . a deadly weapon or dangerous instrument"). We are not persuaded.

"[W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011).

The defendant's claim that the court erred by not giving the jury a *Pond* instruction was waived. The defendant was given a meaningful opportunity to review the instructions, the court solicited comments from both counsel, and the defendant's counsel agreed with the instructions. Almost one week before its final instructions to the jury, the court provided counsel with a copy of its proposed instructions to the jury. Thereafter, the defendant filed his request to charge wherein he made no mention of *State* v. *Pond*, supra, 138 Conn. App. 228. During the charging conference the court noted that it had not made any changes to the instructions on the charge of attempted robbery and asked counsel if there were any concerns as to that instruction; the defendant's counsel responded, "No." Regarding the charge of conspiracy to commit robbery in the first degree, the prosecutor suggested one minor change, to which defense counsel stated he had no objection. The court asked if counsel had any objection to the remainder of its proposed instruction to which defense counsel responded, "No, Your Honor." Following the court's instructions to the jury, defense counsel did not object on the ground that the instructions did not comply with *State* v. *Pond*, supra, 228.

The defendant contends, however, that counsel did not knowingly and intelligently waive this claim pursuant to *Kitchens* because our Supreme Court did not affirm this court's judgment in *State* v. *Pond*, supra, 138 Conn. App. 228, until after the trial of his case. The trial in this case, however, began nearly one year after this court's decision in *Pond*. An instruction pursuant to *State* v. *Pond*, supra, 228, certainly could have been requested; the fact that certification to our Supreme Court had been granted on that case does not affect the waiver of that claim.[5]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was found not guilty of murder in violation of General Statutes § 53a-54a (a); attempt to commit robbery in the first degree in

violation of General Statutes §§ 53-49 and 53a-134 (a) (2); and felony murder in violation of General Statutes § 53a-54c.

[2] As we will discuss in this opinion, the friend's name was Robert Taylor.

[3] The defendant's requested instruction was as follows: "There has been evidence that a third party, not the defendant, committed the crimes with which the defendant is charged. This evidence is not intended to prove the guilt of the third party, but is part of the total evidence for you to consider. The burden remains on the State to prove each and every element of the offense beyond a reasonable doubt. It is up to you, and to you alone, to determine whether any of this evidence, if believed, tends to directly connect a third party to the crimes with which the defendant is charged. If after a full and fair consideration and comparison of all the evidence, you have left in your minds a reasonable doubt indicating that a third party may be responsible for the crimes the defendant is charged with committing, then it would be your duty to render a verdict of not guilty as to the accused, [the defendant]."

[4] The defendant suggested to the jury, in a series of rhetorical questions, that it was likely that Harper was the shooter, and that the four conspirators preferred to implicate the defendant rather than Harper, with whom the conspirators were more familiar.

[5] In the alternative, the defendant requests plain error review and review under our supervisory authority. The defendant cannot prevail under the plain error doctrine. "[A] valid waiver . . . thwarts plain error review of a claim. [The] Plain Error Rule may only be invoked in instances of forfeited-but-reversible error . . . and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid waiver, there is no error for us to correct." (Internal quotation marks omitted.) *State* v. *Rosado*, 147 Conn. App. 688, 702, 83 A.3d 351, cert. denied, 311 Conn. 928, 86 A.3d 1058 (2014). This is not an extraordinary situation in which exercise of our supervisory authority is warranted. See *State* v. *Fuller*, 158 Conn. App. 378, 392, 119 A.3d 589 (2015) ("[s]upervisory authority is an extraordinary remedy that should be used sparingly" [internal quotation marks omitted]).

———————————————