******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

REYNALDO ARROYO *v.* COMMISSIONER
OF CORRECTION
(AC 38431)

Alvord, Mullins and Norcott, Js.

*Argued January 19—officially released April 25, 2017*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Moira L. Buckley*, assigned counsel, for the appellant (petitioner).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Angela R. Macchiarulo* and *Michael J. Proto*, senior assistant state's attorneys, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, Reynaldo Arroyo, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claims that the court (1) abused its discretion in denying his petition for certification to appeal and (2) improperly concluded that his trial counsel did not provide ineffective assistance and that his claim of prosecutorial impropriety was procedurally defaulted. Because the petitioner has failed to demonstrate that the habeas court abused its discretion in denying his petition for certification to appeal, we dismiss the appeal.

The following factual and procedural history is relevant to this appeal. In March, 2001, the petitioner, a crack cocaine addict, lived with his girlfriend, Sherry Krick, in her apartment in a condominium complex in Middletown. Richmond L. Perry, a crack cocaine dealer, lived in the same condominium complex. The petitioner knew Perry and often acted as a "runner," or intermediary, for him in his drug dealing business.

In the afternoon of March 28, 2001, at approximately 2 p.m., the petitioner asked his neighbor, Charles Smith, if he could borrow money, promising to pay the money back after he went on "a mission." Later that evening, at about 8 p.m., the petitioner and Perry drove to Mike's Package Store in Middlefield. While in the store, an argument ensued between the petitioner, Perry, and the owner of the store, Edmund Caruso. As the argument escalated, Perry drew a nine millimeter firearm. In response, Caruso grabbed his tear gas canister and sprayed it at Perry and the petitioner. Perry then shot Caruso several times, and Caruso subsequently died as a result of his wounds. Following the shooting, the petitioner and Perry fled from the scene with the package store's cash register.

When they returned to their condominium complex, Perry first went home to change his clothing, which was covered in tear gas, and to shower. After showering, the petitioner and Perry wrapped the register in the petitioner's blanket and carried it into his and Krick's apartment, where the petitioner used a screwdriver to open it. The petitioner and Perry divided the proceeds from the register and then hid it behind the bedroom dresser.

That same evening, the petitioner and Perry offered to sell Smith the firearm that they used in the robbery, but he declined to purchase it. The petitioner subsequently arranged to sell the firearm to Juan Cruz, another crack cocaine dealer with whom he was associated. On March 31, 2001, the petitioner and Perry met with Cruz and sold him the firearm, assuring him that it was "clean," i.e., not associated with any crimes.[1]

In the days following the robbery, the petitioner

spoke to Smith about the result of his "mission." Two or three days after the robbery, Smith visited Krick's apartment. The petitioner showed Smith the register behind the bedroom dresser and told him that "it was from his mission, but he had to get rid of it." Sometime thereafter, Smith saw the petitioner throw the register into the dumpster outside the condominium complex. The petitioner later told Smith that "things went bad when he went to do that mission. Things went bad. The old man got killed. No one meant for the old man to get killed."

During the course of the investigation of the robbery, the petitioner made several written and oral statements to the police.[2] The petitioner admitted to knowing details about the robbery, but he insisted that Perry committed the robbery and murder and told him about it afterward. Nevertheless, the petitioner acknowledged that Perry came to Krick's apartment with the register after the robbery. He also admitted that he (1) broke open the register with his screwdriver, (2) shared the cash proceeds from the register with Perry, (3) hid the register behind the dresser in his and Krick's bedroom, (4) disposed of the register in a dumpster outside of his and Krick's apartment, and (5) facilitated and participated in the sale to Cruz of the firearm used during the robbery.

Thereafter, the petitioner was charged with felony murder, murder, robbery in the first degree, larceny in the fifth degree, and conspiracy to commit robbery in the first degree. While incarcerated and awaiting trial, the petitioner made statements to two inmates in which he admitted to participating in the robbery with Perry and described what happened during and after the robbery. To one of these inmates, who was the petitioner's friend and former roommate, the petitioner further expressed his concern that his alibi witnesses, Krick and a "married guy,"[3] were not corroborating his story about being home the evening of the robbery.

After a trial, the jury found the petitioner guilty of felony murder, larceny in the fifth degree, and conspiracy to commit robbery in the first degree. The jury found him not guilty, however, of murder and robbery in the first degree, which were the only counts in which the petitioner was charged with personally possessing the firearm or shooting the victim.[4] *State* v. *Arroyo*, 292 Conn. 558, 561–62, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010). The court thereafter rendered judgment accordingly and sentenced the petitioner to a total effective term of sixty years imprisonment. The petitioner's conviction was affirmed on direct appeal. Id., 561.

The petitioner initiated this habeas action on April 8, 2010. On March 13, 2013, the petitioner filed a six count amended petition. Relevant to this appeal, the petitioner claimed that his trial counsel rendered inef-

fective assistance by not (1) offering Perry's plea hearing transcript as an exhibit; (2) presenting the testimony of an expert witness; and (3) offering "a depiction of the floor plan and/or physical layout" of Krick's apartment. Additionally, the petitioner claimed that the prosecutor committed certain improprieties during her case-in-chief and closing argument by soliciting and utilizing Perry's false trial testimony concerning his plea agreement with the state. After a two day trial, the habeas court denied the petition for a writ of habeas corpus and the petition for certification to appeal. This appeal followed.

The petitioner claims that the habeas court abused its discretion by denying his petition for certification to appeal and erred by denying his claims of ineffective assistance of trial counsel and prosecutorial impropriety. We conclude that the habeas court did not abuse its discretion by denying the petition for certification to appeal.

"We begin by setting forth the applicable standard of review and procedural hurdles that the petitioner must surmount to obtain appellate review of the merits of a habeas court's denial of the habeas petition following denial of certification to appeal. In *Simms* v. *Warden*, 229 Conn. 178, 187, 640 A.2d 601 (1994), [our Supreme Court] concluded that . . . [General Statutes] § 52-470 (b) prevents a reviewing court from hearing the merits of a habeas appeal following the denial of certification to appeal unless the petitioner establishes that the denial of certification constituted an abuse of discretion by the habeas court. In *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994), [our Supreme Court] incorporated the factors adopted by the United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as the appropriate standard for determining whether the habeas court abused its discretion in denying certification to appeal. This standard requires the petitioner to demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . A petitioner who establishes an abuse of discretion through one of the factors listed above must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. . . .

"The conclusions reached by the trial court in its decision to dismiss [a] habeas petition are matters of law, subject to plenary review. . . . [When] the legal

conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Brewer* v. *Commissioner of Correction*, 162 Conn. App. 8, 12, 130 A.3d 882 (2015). Having set forth the standard of review, we will consider the merits of the claims raised by the petitioner.

I

We begin by addressing the petitioner's two claims relating to Perry's plea agreement with the state. First, the petitioner claims that the habeas court erroneously concluded that trial counsel did not render ineffective assistance when he failed to offer Perry's plea hearing transcript as an exhibit. Second, the petitioner claims that the habeas court erroneously concluded that his prosecutorial impropriety claim was procedurally defaulted. That second claim was based on the prosecutor's alleged solicitation and use during the state's case-in-chief and closing argument of Perry's false testimony concerning his plea agreement. The petitioner contends that the procedural default was cured by good cause, namely, ineffective assistance of trial counsel in failing to raise a claim of prosecutorial impropriety at trial and sentencing and in failing to preserve this issue for direct appeal. We disagree.

The following additional facts are relevant to both of these claims. On January 21, 2003, Perry pleaded guilty to felony murder and robbery in the first degree. During her recitation of the factual basis for the guilty pleas, the prosecutor, who was also prosecuting the petitioner's case, did not indicate which of the two defendants the state believed committed the shooting; instead, she stated that "Mr. Caruso was shot and killed by one of the participants in the robbery . . . who was Mr. Perry or Mr. Arroyo."[5] After setting forth the factual basis for the pleas, the prosecutor explained that she had agreed to recommend a sentence of "forty-five years to serve." She emphasized that "our offer of forty-five years is predicated and based on [Perry's] agreement to testify in a truthful manner only regarding Mr. Arroyo's participation in the robbery . . . ."

During the court's canvass, Perry repeatedly confirmed that he understood that the recommended sentence of forty-five years was contingent on his truthful testimony at the petitioner's criminal trial. After the

court accepted Perry's guilty pleas, Perry's counsel asked the prosecutor to clarify what the state's definition of truthful was, and the court asked the prosecutor whether Perry's last statement[6] "was essentially the truth." The prosecutor agreed that the last statement was "essentially the truth," and then she further clarified: "The state's understanding of the truth is that Mr. Perry participated in the robbery, which led to the death of Mr. Caruso, in conjunction of Mr. Arroyo."

On December 1 and 2, 2004, Perry testified at the petitioner's criminal trial. During direct examination, Perry confirmed that the prosecutor was also prosecuting him for his involvement in the robbery and that although he had pleaded guilty to two offenses, he had not been sentenced. Perry also confirmed that he was going to receive a forty-five year sentence, that there was no chance that the state would recommend less than forty-five years, and that a condition of him receiving "the forty-five year offer" was not that he identify the petitioner as the shooter.

Trial counsel began his cross-examination by highlighting that although Perry pleaded guilty to felony murder and robbery in the first degree, he still had four pending charges against him—murder, conspiracy to commit robbery in the first degree, larceny in the fifth degree, and violation of probation.[7] Trial counsel discussed with Perry the fact that his sentencing had been postponed until after his testimony in the petitioner's trial and that, unless he testified "in a manner satisfactory to the state," he will not receive a forty-five year sentence. Perry disagreed with trial counsel's assertion that receiving a forty-five year sentence was contingent on his having testified at the petitioner's trial and insisted that forty-five years was "going to be on the table no matter what."

Thereafter, trial counsel thoroughly and systematically reviewed with Perry the maximum term of imprisonment authorized for each of the five crimes with which he was charged in connection with his involvement in the robbery. Trial counsel emphasized at the beginning and end of this lengthy analysis that Perry's maximum sentencing exposure for all of these crimes was 185 years imprisonment. Trial counsel further observed that "forty-five years would be only about a quarter of 185."

Beginning with this early exchange, a theme emerged over the course of trial counsel's lengthy cross-examination. Perry consistently maintained that there was no "deal" and that a forty-five year sentence was always "on the table," and trial counsel repeatedly highlighted for the jury Perry's actual maximum sentencing exposure, the number of serious charges pending against him, and the fact that a sentence of forty-five years was contingent on Perry's testimony for the state.[8]

When, toward the end of trial counsel's cross-examination, Perry continued to deny that he was receiving a "deal," trial counsel observed that "there was a discussion right out here in the public record, in the open court, about what you would have to do to get this sentence." Trial counsel then discussed with Perry the prosecutor's statements about his plea agreement at his guilty plea hearing while presenting Perry with and reading aloud from Perry's guilty plea hearing transcript.[9] Trial counsel did not identify for the jury, however, the document he was showing Perry as Perry's guilty plea hearing transcript, nor did trial counsel offer it as an exhibit.

On redirect examination, the prosecutor asked Perry: "Defense attorney asked you if you were getting forty-five years for your truthful cooperation," and Perry agreed. The prosecutor then asked Perry to confirm that the sentence was forty-five years and that there was "[n]ot a possibility . . . that I'm going to recommend any less of that sentence . . . ?" Perry agreed with the prosecutor's statements and then said: "Forty-five years always been on the table. I could of seen if you came with forty-four years, I would have thought that was a deal. Common sense will tell you that forty-five, forty-five years has been on the table the whole time. That's not a deal." The prosecutor did not correct Perry's false assertion that there was no deal; she stated that she had no further questions.

During summation, trial counsel and the prosecutor commented on Perry's plea agreement with the state. Trial counsel utilized Perry's staunch refusal "to acknowledge he was getting any benefit at all" or the extent of his participation in the robbery to demonstrate Perry's lack of credibility. In particular, trial counsel referred to how, when he presented Perry with the transcript from his plea hearing, in which the prosecutor indicated that he would be sentenced to forty-five years imprisonment for testifying truthfully against the petitioner, Perry continued to refuse to acknowledge the benefit he was receiving.[10] During her rebuttal argument, the prosecutor responded that an agreement to a sentence of forty-five years imprisonment was not much of a benefit in light of Perry's young age and the fact that he will have to spend the next forty-five years in prison with fellow inmates knowing that he testified against his codefendant.

During its final charge to the jury, the court included a special credibility instruction concerning Perry's testimony. In relevant part, the court admonished the jury that it should "carefully scrutinize the testimony of Richmond Perry" and "keep in mind that he may, in his own mind, be looking for or hoping for some favorable treatment in the sentence or disposition of his own case. And that therefore he may have such an interest in the outcome of this case that his testimony may have

been colored by that fact. Therefore, then, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it.''

In his habeas petition, the petitioner alleged that trial counsel rendered ineffective assistance when he failed to offer Perry's plea hearing transcript as an exhibit. Additionally, the petitioner claimed that the prosecutor committed certain improprieties during her case-in-chief and closing argument by soliciting and utilizing Perry's false testimony concerning the nature and existence of his plea agreement. In his return, the respondent, the Commissioner of Correction, pleaded that the petitioner's claim of prosecutorial impropriety was procedurally defaulted because it was not raised before the trial court or on appeal. In his reply, the petitioner argued that ''[a]ny alleged procedural default is cured by good cause and prejudice,'' namely, ineffective assistance of trial counsel.[11]

At the habeas trial, the petitioner called his trial counsel as a witness. Trial counsel recalled that ''Perry insisted that forty-five [years] was on the table and that's always been on the table,'' and he agreed that Perry's testimony in that respect was inaccurate. Trial counsel further acknowledged that during cross-examination he used Perry's plea hearing transcript to refresh Perry's recollection but he did not offer it as an exhibit, even though he could have offered it as impeachment evidence or substantively as a *Whelan* statement.[12] Trial counsel explained, however, that because he cross-examined Perry extensively on his truthfulness and Perry repeatedly admitted that he lied to the police in his written statements, ''[i]t got to the point where it was becoming tedious . . . for the jury to even hear it.''

In its memorandum of decision, the habeas court rejected the petitioner's claim of ineffective assistance of counsel and determined that his claim of prosecutorial impropriety was procedurally defaulted. With respect to the claim of ineffective assistance of counsel, the habeas court assumed, arguendo, that trial counsel rendered deficient performance by not offering Perry's plea hearing transcript as an exhibit. The court further held that the petitioner failed to satisfy the prejudice prong of *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), because its ''confidence in the jury's verdict remain[ed] high despite the inaccuracy of Perry's description of his plea agreement.'' With respect to the petitioner's claim that the prosecutor committed certain improprieties by failing to correct Perry's misrepresentation of his plea agreement, the court held that the claim was procedurally defaulted because ''[t]he petitioner submitted no evidence of any good cause justifying his failure to assert any previously omitted trial misconduct claim at trial or on appeal.''

## A

The petitioner argues that trial counsel rendered ineffective assistance when he failed to offer Perry's plea hearing transcript as an exhibit because the transcript demonstrates that (1) Perry's plea agreement was contingent on his having testified "truthfully" at the petitioner's criminal trial; (2) the state's definition of "truthfully" required Perry to identify the petitioner as the shooter; (3) Perry had a significant incentive to lie and to identify the petitioner as the shooter at trial; and (4) "the prosecutor was willing to give the jury the wrong impression, by soliciting and eliciting false testimony and then perpetuating it in summation, about a plea deal that was critical to the key witness' credibility." The respondent replies that in light of the totality of the evidence before the jury, the petitioner cannot prove there is a reasonable probability that but for trial counsel's alleged errors the result of the proceeding would have been different. We agree with the respondent.

To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, supra, 466 U.S. 687. *Strickland* requires that a petitioner satisfy both a "performance prong" and a "prejudice prong." To satisfy the performance prong, "a [petitioner] must show that counsel's conduct fell below an objective standard of reasonableness for competent attorneys [as measured by prevailing professional norms]." *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 555, 126 A.3d 538 (2015), cert. denied sub nom. *Semple* v. *Davis*, U.S. , 136 S. Ct. 1676, 194 L. Ed. 2d 801 (2016); *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 703, 699 A.2d 1003 (1997). To satisfy the prejudice prong, "a [petitioner] must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors." *Davis* v. *Commissioner of Correction*, supra, 555. "The claim will succeed only if both [*Strickland*] prongs are satisfied. . . . It is well settled that [a] reviewing court can find against a petitioner on *either* ground, whichever is easier." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 713, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

We are not persuaded that there is a reasonable probability that had the jury been presented with Perry's plea hearing transcript the outcome of the petitioner's criminal trial would have been different. As our Supreme Court observed on direct appeal, the state presented "strong evidence that the [petitioner] had participated in the robbery." *State* v. *Arroyo*, supra, 292 Conn. 575. The petitioner admitted to the police that he (1) broke open the register with his screwdriver, (2)

shared the cash proceeds from the register with Perry, (3) hid the register behind the dresser in his and Krick's bedroom, (4) disposed of the register in a dumpster outside of his and Krick's apartment, and (5) facilitated and participated in the sale of the firearm used during the robbery to shoot the victim. Although the petitioner maintained in his statements to the police that he did not participate in the robbery, the petitioner admitted to Smith and two fellow inmates to being involved in the robbery.[13] Finally, the state presented evidence that a jacket seized from the petitioner and Krick's apartment, which matched the description of the jacket the petitioner admitted to wearing on March 28, 2001, was contaminated with the active ingredient in the tear gas used by the victim to fight off his attackers.

Perry, as an admitted participant in the robbery, was an important witness. Trial counsel's thorough and surgical cross-examination of Perry, however, made the jury abundantly aware of Perry's motive to lie and to implicate the petitioner in the robbery. Throughout the course of cross-examination, trial counsel reminded the jury of Perry's original charges, of the charges that remained pending against Perry, of Perry's maximum sentencing exposure for each of those charges as well as his total maximum sentencing exposure, and of the fact that Perry's sentencing had been postponed until after he testified against the petitioner. Trial counsel also reviewed Perry's prior inconsistent statements with him in detail, and Perry admitted on numerous occasions that he had lied to the police in all of his written statements. Trial counsel further demonstrated that Perry's lies in his written statements were often designed either to establish that he was not present for the robbery or, when he became aware that physical evidence placed him in the midst of the robbery, to mitigate his role in the robbery by suggesting that he was present for the robbery by happenstance, not as an active participant.

The petitioner argues that "simply because [trial counsel] cross-examined Perry extensively regarding the plea deal does not mean that he was effective in showing that Perry was untruthful." We disagree. It is clear from the jury's verdict that the jury did not credit all of Perry's testimony. Perry insisted at trial that the petitioner shot the victim. Nevertheless, the jury found the petitioner not guilty of robbery in the first degree and murder, the only counts in which the petitioner was charged with either personally possessing the firearm used in the robbery or shooting the victim. See footnote 4 of this opinion.

Therefore, we conclude that the habeas court did not abuse its discretion when it denied the petitioner's petition for certification to appeal as to his claim of ineffective assistance of counsel that was based on trial counsel's failure to offer Perry's plea hearing transcript

as an exhibit.

B

The petitioner's second claim concerning Perry's plea agreement with the state is that the prosecutor committed certain improprieties when she (1) solicited false testimony from Perry on direct examination, (2) permitted Perry's false testimony to stand on cross-examination, and (3) "made statements and suggested inferences to the jury that were false and in which she emphasized Perry's false testimony." The petitioner claims that the habeas court erred when it concluded that this claim was procedurally defaulted. The petitioner contends that he satisfied the cause and prejudice standard by proving that "trial counsel's failure to raise the issue of prosecutorial [impropriety] at trial or at sentencing, and particularly by failing to mark Perry's plea hearing transcript as either a full trial exhibit or an exhibit for [identification] constituted ineffective assistance of counsel . . . ." The respondent argues that because the habeas court rejected the petitioner's claim of ineffective assistance of counsel, the habeas court properly found that the petitioner failed to satisfy the cause and prejudice standard. We agree with the respondent.

"We begin our analysis by setting forth the appropriate standard of review on appeal. Our review of a determination of the application of procedural default involves a question of law over which our review is plenary." (Internal quotation marks omitted.) *Wilcox* v. *Commissioner of Correction*, 162 Conn. App. 730, 740, 129 A.3d 796 (2016).

Under the procedural default doctrine, "a claimant may not raise, in a collateral proceeding, claims that he could have made at trial or on direct appeal in the original proceeding," unless he can prove that his default by failure to do so should be excused. *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 852, 97 A.3d 986 (2014), aff'd, 321 Conn. 56, 136 A.3d 596 (2016). "When a respondent seeks to raise an affirmative defense of procedural default, the rules of practice require that he or she must file a return to the habeas petition 'alleg[ing] any facts in support of any claim of procedural default . . . or any other claim that the petitioner is not entitled to relief.' Practice Book § 23-30 (b). 'If the return alleges any defense or claim that the petitioner is not entitled to relief, and such allegations are not put in dispute by the petition, the petitioner shall file a reply.' Practice Book § 23-31 (a). 'The reply shall allege any facts and assert any cause and prejudice claimed to permit review of any issue despite any claimed procedural default.' Practice Book § 23-31 (c)." *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 567, 941 A.2d 248 (2008).

"The cause and prejudice standard [of reviewability]

is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, [inadvertence] or ignorance . . . . In order to satisfy this standard, the [habeas] petitioner must demonstrate *both* good cause for failing to raise a claim at trial or on direct appeal *and* actual prejudice from the underlying impropriety. . . . [T]he existence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the [s]tate's procedural rule. . . .

"With respect to the actual prejudice prong, [t]he habeas petitioner must show not merely that the errors at . . . trial created the *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. . . . Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied fundamental fairness at trial. . . . [A] habeas petitioner's showing of ineffective assistance of counsel demonstrates such actual prejudice." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Wilcox* v. *Commissioner of Correction*, supra, 162 Conn. App. 740–41; see also *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 567–68.

In the present case, to satisfy the cause and prejudice standard, the petitioner first would have to establish that trial counsel rendered ineffective assistance by not raising a claim of prosecutorial impropriety at trial or preserving the issue for appeal. To prove ineffective assistance of counsel, the petitioner would have to establish that there is a reasonable probability that the outcome of the petitioner's trial would have been different but for trial counsel's error. See *Davis* v. *Commissioner of Correction*, supra, 319 Conn. 555. That is, the petitioner would have to establish that had a claim of prosecutorial impropriety been raised by trial counsel, a court would have concluded that a prosecutorial impropriety occurred and that it deprived him of his right to a fair trial. See *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

On the basis of our review of the record, we cannot conclude that the habeas court erred in finding that the petitioner's prosecutorial impropriety claim was procedurally defaulted. As we discussed in part I A of this opinion, the state presented "strong evidence that the [petitioner] had participated in the robbery." *State* v. *Arroyo*, supra, 292 Conn. 575. Trial counsel thoroughly cross-examined Perry concerning his motive to lie to avoid a significantly longer sentence and additional convictions. The jury's verdict further reveals that the jury, at the very least, did not credit Perry's testimony that the petitioner possessed the firearm used in the robbery

or shot the victim. Accordingly, because the petitioner failed to prove that trial counsel rendered ineffective assistance by not raising a claim of prosecutorial impropriety before the trial court or by failing to preserve this issue for appeal, he has failed to satisfy the cause and prejudice standard.

Therefore, we conclude that the habeas court did not abuse its discretion when it denied the petitioner's petition for certification to appeal as to his claim of prosecutorial impropriety.

II

The petitioner next claims that the habeas court erroneously concluded that trial counsel did not render ineffective assistance when he failed to consult with experts about whether the tear gas found on the petitioner's jacket was the result of a secondary transfer[14] from the register and to call an expert to testify concerning that secondary transfer theory.[15] The respondent argues that the habeas court properly concluded that trial counsel rendered effective assistance because trial counsel testified that he consulted with several experts about the secondary transfer theory, but none provided an opinion that was helpful to the defense. We agree with the respondent.

At the petitioner's criminal trial, Dr. Jack Hubball, a criminalist in the chemistry section of the state forensic laboratory, testified that on one of the jackets officers seized from the petitioner and Krick's apartment he located "two [reddish brown] droplet-like stains on the upper left hand portion" of the jacket. Hubball tested the chemical makeup of those droplets and determined that they contained traces of a chemical compound known as CS, which was the active ingredient in the tear gas canister found near the victim's body. Hubball testified that he believed that the droplets were the result of the chemical compound being sprayed directly onto the jacket and were not the result of a secondary transfer from another object.

At the habeas trial, the petitioner called Kamran Loghman, an expert on tear gas, and trial counsel as witnesses. Loghman did not dispute Hubball's finding that there was CS on the petitioner's jacket and agreed that CS was an active ingredient in the brand of tear gas found near the victim's body. Instead, Loghman opined that because of the physical and chemical properties of CS, it would not "cause any kind of shape on any article of clothing" and "[i]t doesn't discolor fabrics." As a result, Loghman concluded that "something else that got saturated and contaminated came into contact with this pullover [jacket] and passed on the tear gas." He acknowledged, however, that he could not determine when that secondary transfer occurred and that the transfer could have happened inside the package store.

Trial counsel testified that it was important to the defense to neutralize the tear gas evidence because it was the only physical evidence that placed the petitioner in the package store. As a result, he consulted with several experts on tear gas, including Loghman. Loghman, in particular, confirmed that the substance on the jacket was CS and provided referrals to other experts who might help him address the issues. Although trial counsel did not recall asking Loghman specifically about the secondary transfer theory,[16] he recalled asking other experts whether the CS on the jacket was a smear or a droplet and "what opinion we might get as to getting a contact transfer from a cash register." Trial counsel testified that none of these experts rendered a positive or helpful opinion, and, therefore, he decided not to call an expert witness to rebut Hubball's testimony.

The habeas court concluded that the petitioner failed to establish that trial counsel rendered deficient performance by not calling an expert witness on tear gas because trial counsel "made diligent efforts to locate and consult with an expert such as Loghman . . . but none [of the experts he contacted] were willing to provide the defense with useful information."[17]

"Paramount to the effective assistance of counsel is the obligation by the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case." *Walton* v. *Commissioner of Correction*, 57 Conn. App. 511, 521, 749 A.2d 666, cert. denied, 254 Conn. 913, 759 A.2d 509 (2000). "We are mindful that, under certain circumstances, the failure to use *any* expert can result in a determination that a criminal defendant was denied the effective assistance of counsel." (Emphasis in original.) *Peruccio* v. *Commissioner of Correction*, 107 Conn. App. 66, 76, 943 A.2d 1143, cert. denied, 287 Conn. 920, 951 A.2d 569 (2008). Nevertheless, "the question of whether to call an expert witness *always* is a strategic decision." (Emphasis in original.) *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 636 n.7, 126 A.3d 558 (2015). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 680, 51 A.3d 948 (2012).

In the present case, the habeas court credited trial counsel's testimony that he consulted with multiple experts about the possibility that the CS on the petitioner's jacket was the result of a secondary transfer from the register, but none of those experts provided opin-

ions that were helpful to the defense. As a result, trial counsel made a reasonable tactical decision not to retain an expert witness for trial. Therefore, we cannot conclude that the habeas court erred in denying the petitioner's claim.

The petitioner nevertheless contends that "[t]he habeas court's findings regarding [trial counsel's] efforts were clearly erroneous" because "[trial counsel] never asked the critical question about secondary transfer" when speaking to potential expert witnesses. Instead, the petitioner states that trial counsel erroneously "focused on whether the marks were 'droplets or smears,'" which Loghman testified was irrelevant because CS does not "cause any kind of shape on any article of clothing" and "[i]t doesn't discolor fabrics."

As previously stated, however, trial counsel testified at the habeas trial that when speaking with experts on tear gas he asked the experts *both* whether the CS on the jacket was a smear or a droplet *and* "what opinion we might get as to getting a contact transfer from a cash register." Although the petitioner's expert witness might contend that the issue of whether the stains were smears or droplets is a red herring, the critical aspect of trial counsel's testimony was that he asked experts about the secondary transfer theory. None of these experts was willing to give him a favorable opinion on that theory. Accordingly, we cannot conclude that the habeas court's finding that trial counsel made diligent efforts to locate an expert on the secondary transfer issue was clearly erroneous.

Therefore, we conclude that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal as to his claim of ineffective assistance of counsel that was based on trial counsel's failure to call a tear gas expert at trial.

### III

The petitioner's final claim is that the habeas court erroneously concluded that trial counsel did not render ineffective assistance when he "failed to introduce photographs or other evidence of the physical layout of [Krick's] apartment" because they would have "buttress[ed] the credibility of the petitioner's alibi witness," Marcel Bartelle. The respondent argues that the habeas court properly rejected the petitioner's claim of ineffective assistance of counsel because trial counsel made a reasonable tactical decision not to introduce those photographs and potentially weaken the alibi witness' testimony. We agree with the respondent.

The following additional facts are relevant to this claim. In his first and second written statements to the police, the petitioner stated that he was home with Krick on the evening of March 28, 2001, the night of the robbery. He admitted in both statements, however, that Perry came to Krick's apartment at one point that

night with a black man, identified at the habeas trial as Darcel Moody, and the register, which he helped Perry carry into Krick's apartment, open with a screwdriver, and hide behind the dresser. In his third written statement, the petitioner claimed to have been home the entire evening of March 28, 2001, with Krick *and* Bartelle. The petitioner continued to acknowledge that Perry came by his apartment with Moody and the register after the robbery and that he helped Perry carry in, open, and hide the register.

At the petitioner's criminal trial, Bartelle testified that he went to the petitioner and Krick's apartment after work, between 6:30 p.m. and 7 p.m. Bartelle testified that when he arrived the petitioner was alone and that they remained alone until approximately 9:30 p.m. when Perry arrived. The reason Perry came over, Bartelle explained, was that he wanted to purchase some crack cocaine. Bartelle testified that Perry remained briefly at the apartment to find out what Bartelle wanted to purchase and to pick it up. Bartelle stated that on the two brief occasions Perry was at Krick's apartment, Perry was alone, and that he never saw Perry carry anything into the apartment, aside from the crack cocaine. Bartelle stated that Krick returned home at approximately 11 p.m. and asked him to leave, which he did. Bartelle maintained that between the time he arrived at the apartment and the time he left the apartment the petitioner never left his presence in the kitchen for more than two or three minutes. Bartelle testified that, as a result, if the petitioner had been prying open a register while he was at the apartment, he would have been aware of it, but he did not see or hear the petitioner carry in or pry open a register.

At the habeas trial, the petitioner asked trial counsel why he did not introduce photographs of Krick's apartment for the purpose of explaining why Bartelle might not have seen Perry come to the apartment with Moody if Moody had remained standing at the front door to the apartment. Trial counsel responded that he did not recall why he did not introduce photographs for that particular purpose.[18] The habeas court concluded that trial counsel did not render ineffective assistance by not introducing evidence of the physical layout of Krick's apartment to explain why Bartelle did not see anyone with Perry. The habeas court reasoned that "even an innocuous error by Bartelle as to who arrived at Krick's condominium when, and with whom, could reflect badly on Bartelle as a witness. Rather than appear to concede the likelihood that Perry had a companion when he came to Krick's place, [trial counsel] elected to present the alibi defense contained in Bartelle's version of these events unsullied by inconsistency or mistake."

We agree with the habeas court that the petitioner failed to establish that trial counsel rendered ineffective

assistance by not introducing evidence of the physical layout of Krick's apartment to explain why Bartelle did not see Moody. We have recognized repeatedly that because of the difficulties inherent in evaluating an attorney's performance in hindsight, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Henderson* v. *Commissioner of Correction*, 104 Conn. App. 557, 572, 935 A.2d 162 (2007), cert. denied, 285 Conn. 911, 943 A.2d 470 (2008). The petitioner failed to overcome this presumption in the present case. Bartelle's testimony was inconsistent with the petitioner's statements in several respects. We agree with the habeas court that it was a reasonable tactical decision for trial counsel not to emphasize further the inconsistency concerning Moody's presence at Krick's apartment on March 28, 2001 by introducing evidence of the apartment's layout in an attempt to explain why Bartelle might not have seen Moody.

Therefore, we conclude that the habeas court did not abuse its discretion in denying the petitioner's petition for certification to appeal as to his claim of ineffective assistance of counsel that was based on trial counsel's failure to introduce evidence of the layout of Krick's apartment to explain why Bartelle might not have seen Moody.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] Police officers, with the assistance of the petitioner, subsequently recovered the firearm from Cruz.

[2] In his first two written statements to the police, the petitioner used an alias, Juan Roman.

[3] The petitioner's alibi witness at trial, Marcel Bartelle, is married.

[4] With respect to the charge of murder, the state alleged that "Reynaldo Arroyo with intent to cause the death of another person did cause the death of such person, namely, Edmund Caruso, by use of a firearm . . . ." With respect to the charge of robbery in the first degree, the state alleged that the petitioner "did commit a robbery of Edmund Caruso, and in the course of the commission of the robbery, Reynaldo Arroyo was armed with a deadly weapon, to wit: a nine millimeter pistol . . . ."

Conversely, with respect to the charge of felony murder, the state alleged that "Reynaldo Arroyo and Richmond Perry did commit a robbery [of Mike's Package Store] [a]nd in the course of and in furtherance of such crime, Reynaldo Arroyo or another participant, to wit, Richmond Perry, did cause the death of a person other than one of the participants, namely, Edmund Caruso . . . ." With respect to the charge of conspiracy to commit robbery, the state alleged that "Reynaldo Arroyo with intent that conduct constituting [robbery in the first degree] be performed . . . did agree with another person, namely, Richard Perry, to engage in or cause the performance of such conduct . . . . In pursuance of such conspiracy, Reynaldo Arroyo and Richmond Perry committed one or more overt acts . . . ." The overt acts listed all alleged joint conduct by the petitioner and Perry, e.g., "Reynaldo Arroyo and Richmond Perry did enter such store armed with a weapon, to

wit, a nine millimeter handgun."

[5] The prosecutor also explained that Perry had given several statements and that, "in essence, he admits in at least one of his statements that was given April 10th that he was at the robbery where Mr. Caruso was killed. And he admits that he was at the package store during the robbery and that Mr. Caruso was killed as a result of that." In each of the statements provided by Perry, however, he implicated someone other than himself, including the petitioner, as the shooter.

[6] In Perry's last written statement, he admitted to being present for the robbery, but he identified the petitioner as the instigator of the robbery and the shooter.

[7] The violation of probation was unrelated to the robbery information.

[8] For example, trial counsel engaged in the following colloquies with Perry concerning his motive to testify to obtain a lower sentence:

"[Trial Counsel]: So, you're sitting here today telling us that you have pled guilty to robbery [in the] first degree, felony murder, and agree to a sentence of forty-five years, which is no deal even though you can get 180, but you didn't commit a robbery, right? That's what you're telling us?

"[Perry]: I was in the store with [the petitioner]; that's what made me guilty for pushing the dude that [the petitioner] shot the dude, so that's why I'm pleading guilty.

\*\*\*

"[Trial Counsel]: Okay. How many lies have we got so far in this statement, Mr. Perry?

"[Perry]: I don't know. I told you in four statements I lied about it. But it's no reason for me to lie about it now because what's the reason for me to lie about it? I got forty-five years on mine, so what's the reason for me to lie about it?

"[Trial Counsel]: Forty-five years when you could get 185, Mr. Perry—

"[Perry]: What is forty-five . . .

"[Trial Counsel]: —in many people's minds.

"[Perry]: It's no reason for me to lie about it . . . .

"[Trial Counsel]: And that's the point, you didn't help him do anything because you were innocent, you are completely innocent of anything—

"[Perry]: Nn.

"[Trial Counsel]: —in the store, except pushing that old man with your hands, like this . . . and driving the car, I guess, back, is that it, back to the apartment, that's what you're guilty of, right?

"[Perry]: Yep.

"[Trial Counsel]: And that's why you plead to a set, to two offenses for which you're getting forty-five years for pushing a man and driving a car back after a committed crime that you didn't even know it was going to happen, right?

"[Perry]: Yep.

"[Trial Counsel]: But of course we know it has nothing to do with 185 years?

"[Perry]: It was always forty-five years on the table.

\*\*\*

"[Trial Counsel]: And of course, you wouldn't lie in court, is that what you're trying to get us to understand?

"[Perry]: . . . I wouldn't be on the stand and just come on the stand on my own just to tell some lies on the statement.

"[Trial Counsel]: You're on the stand.

"[Perry]: I mean on the stand.

"[Trial Counsel]: Well, you're getting, you're getting a plea bargain, aren't you?

"[Perry]: It's not a plea bargain. It always been forty-five years on the table, so.

"[Trial Counsel]: And how do you think it got to be the forty-five years on the table, that it just appeared for this type of crime that has been committed. The state just out of the goodness of their hearts offered you forty-five years for nothing?

"[Perry]: Well, you have to ask my lawyer that. He came to me with that, so. You have to ask him that.

\*\*\*

"[Trial Counsel]: And you are not testifying here today that you didn't know that if you reneged on your promise and did not testify as set out for you, that there would be no agreed recommendation and the state would be asking for a much higher sentence at the time you got sentenced. You're not testifying to that are you?

"[Perry]: Once again, I've been had forty-five years on the table, and that's all I've been hearing."

[9] In relevant part, the following exchange occurred while trial counsel presented Perry with his plea hearing transcript:

"[Trial Counsel]: Let me see if this refreshes you of your recollection. This part right here, read that. What you had to do in order to get the benefit of this, the offer from the prosecutor of forty-five years, is to testify in a truthful manner only regarding [the petitioner's] participation in the robbery, that's correct, isn't it?

"[Perry]: She added on to it, but I knew forty-five years was on the table.

"[Trial Counsel]: But you agree that's what was said, right?

"[Perry]: That's on the paper.

"[Trial Counsel]: Okay. And that if you should renege on that promise and decide not to do that, there is no agreed recommendation and the state would ask for a much higher sentence at that time, isn't that correct?

"[Perry]: I, she never told me that part.

"[Trial Counsel]: But it was said, wasn't it?

"[Perry]: No, it was not said.

"[Trial Counsel]: Well, take a look.

"[Perry]: It's on the paper, but it was never said.

"[Trial Counsel]: Well, you were standing in open court, weren't you?

"[Perry]: That was never said to me.

"[Trial Counsel]: I see. But it is on the paper, right?

"[Perry]: It's on paper. But no matter what, I have forty-five years on the table, and I was gonna take the stand anyway."

[10] Trial counsel argued in relevant part: "And when I presented him with a transcript, the transcript of his plea hearing where he pled guilty and had him read it, read where he, where the state's attorney indicated that he was getting this sentence to testify truthfully but against the defendant Arroyo only. He got a plea bargain deal to testify against Reynaldo Arroyo . . . ."

[11] The petitioner also argued in his reply that the procedural default was cured by the ineffective assistance of appellate counsel in failing to raise a claim of prosecutorial impropriety on appeal. At the conclusion of the habeas trial, however, the petitioner withdrew his claim of ineffective assistance of appellate counsel.

[12] See *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86 (allowing the substantive use of prior written inconsistent statements, signed by declarant, who has personal knowledge of facts stated, when declarant testifies at trial and is subject to cross-examination), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); see also Conn. Code Evid. § 8-5 (1).

[13] Police officers interviewed the petitioner after Smith provided a written statement concerning his conversations with the petitioner about the robbery to see if the petitioner thought the statement was accurate. The petitioner told the police officers that it was accurate except that he did not tell Smith that he was personally involved in the robbery. Instead, he stated that during his conversation with Smith, he was "*imagining*" what occurred inside the package store during the robbery and that that must have confused Smith about his involvement in the robbery. (Emphasis added.)

[14] The parties and the witnesses in the present case have used both the terms "secondary transfer" and "contact transfer" to describe the phenomenon of tear gas transferring from the register onto the petitioner's jacket. For consistency, we refer to this phenomenon as "secondary transfer" unless we quote a witness' testimony.

[15] The petitioner also claims that the habeas court "incorrectly precluded the petitioner from recalling [his habeas expert witness] [Kamran] Loghman to rebut" trial counsel's testimony that "he had consulted with Loghman prior to the criminal trial." The respondent argues that the petitioner's claim is unreviewable because he did not raise it in his petition for certification to appeal. We agree with the respondent.

"This court has determined that a petitioner cannot demonstrate that the habeas court abused its discretion in denying a petition for certification to appeal if the issue that the petitioner later raises on appeal was never presented to, or decided by, the habeas court. . . . Under such circumstances, a review of the petitioner's claims would amount to an ambuscade of the [habeas] judge." (Internal quotation marks omitted.) *Tutson* v. *Commissioner of Correction*, 144 Conn. App. 203, 217, 72 A.3d 1162, cert. denied, 310 Conn. 928, 78 A.3d 145 (2013).

Neither the petition for certification to appeal nor the petitioner's application for a waiver of fees, costs and expenses include an evidentiary claim that the court erred in precluding him from recalling Loghman to testify as

to whether trial counsel contacted him. In his petition for certification to appeal, the petitioner listed five grounds, only one of which relates to the expert witness issue: "5. Whether the court erred in denying the petition based on its finding that trial counsel was not ineffective for failing to call a tear gas expert?" The language in this fifth ground for appeal is insufficient to raise distinctly, and thereby preserve, the petitioner's evidentiary claim. See *Foote* v. *Commissioner of Correction*, 151 Conn. App. 559, 571, 96 A.3d 587 (*Keller, J.*, concurring) ("well settled in our decisional law is that a petitioner is unable to demonstrate that a habeas court abused its discretion in denying a petition for certification to appeal on the basis of questions that were not raised distinctly before the habeas court at the time that it considered the petition for certification to appeal"), cert. denied, 314 Conn. 929, 102 A.3d 709 (2014); accord *Melendez* v. *Commissioner of Correction*, 141 Conn. App. 836, 841, 62 A.3d 629, cert. denied, 310 Conn. 921, 77 A.3d 143 (2013); *Campbell* v. *Commissioner of Correction*, 132 Conn. App. 263, 267, 31 A.3d 1182 (2011). Accordingly, we decline to review it for the first time on appeal.

[16] Trial counsel explained that if he had discussed the secondary transfer theory with Loghman, he would have noted that discussion in his notes, which he did not.

[17] In its memorandum of decision, the court found that trial counsel "consulted *with* Loghman, 'although Mr. Loghman forgot about that consultation.' " (Emphasis in original.) The petitioner claims that "[t]he habeas court committed clear error when it concluded that [trial counsel] had consulted with Loghman 'although Loghman forgot about the consultation.' " We disagree with the petitioner to the extent that he argues that the habeas court's finding that trial counsel consulted with Loghman was clearly erroneous because trial counsel testified that he consulted with Loghman.

We agree with the petitioner, however, that the habeas court's finding that "Loghman forgot about the consultation" was clearly erroneous. At the habeas trial, the petitioner first called Loghman to testify. After Loghman's testimony, the petitioner called trial counsel, who unexpectedly testified that Loghman was one of the experts he consulted. The next day, the petitioner sought to recall Loghman telephonically as a witness, even though he had been released as a witness and left the state. Habeas counsel represented that Loghman "had no recollection of talking to [trial counsel]" and that Loghman's firm had a strict policy about not having "casual conversations without being retained." The habeas court did not permit habeas counsel, however, to recall Loghman. See footnote 15 of this opinion. Accordingly, the habeas court's finding that Loghman forgot about his conversation with trial counsel is not supported by any evidence in the record. See *State* v. *Duntz*, 223 Conn. 207, 236, 613 A.2d 224 (1992) (statements made by attorneys not facts in evidence; finder of fact may not properly consider them as evidence); *Tevolini* v. *Tevolini*, 66 Conn. App. 16, 26, 783 A.2d 1157 (2001) ("representations of counsel are not, legally speaking, evidence" [internal quotation marks omitted]); see also *Anderson* v. *Commissioner of Correction*, 114 Conn. App. 778, 784, 971 A.2d 766 (habeas court's factual findings reviewed under clearly erroneous standard), cert. denied, 293 Conn. 915, 979 A.2d 488 (2009).

[18] Trial counsel did introduce into evidence several photographs of Krick's apartment at trial for other purposes.